**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| NATIONAL COUNCIL OF PRISON LOCALS, AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, and<br><br>CPL-33, AFGE Local 1661, AFL-CIO,<br><br>               *Plaintiffs*,<br><br>     v.<br><br>FEDERAL BUREAU OF PRISONS, and<br><br>WILLIAM K. MARSHALL, III, *in his official capacity as Director of Federal Bureau of Prisons*,<br><br>               *Defendants*. | Case No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

## INTRODUCTION

1.      "Justice Holmes famously wrote that men must turn square corners when they deal with the Government, [b]ut it is also true, particularly when so much is at stake, that the Government should turn square corners in dealing with the people." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 24 (2020) (cleaned up).

2.      In this case, the government has cut every corner in dealing with the livelihood of its employees.

3.      On September 25, 2025, the Director of the Federal Bureau of Prisons (BOP) William Marshall announced that, "effective immediately," BOP was terminating its collective bargaining agreement (CBA) with the National Council of Prison Locals, American Federation of Government Employees (CPL-33 or "the union").

4.      BOP's termination letter claimed that the termination was to carry out Executive Order 14251. That Executive Order was issued six months earlier and purported to exempt—on national security grounds—BOP and other agencies from the collective bargaining requirements of the Federal Service Labor-Management Relations Statute (FSLMRS). By the government's own admission, however, the Executive Order does not require agencies like BOP to terminate existing CBAs. Rather, according to the government, agencies "may choose" whether to terminate a CBA. But if agencies wish to go down this path, they must at a minimum comply with the requirements of Administrative Procedure Act (APA) for reasoned decisionmaking.

5.      The same day that BOP terminated its CBA with CPL-33, Director Marshall penned a "Message from the Director" that made clear the termination had nothing to do with implementing EO 14251 or its national security purposes.

6.      In Marshall's own words, "[t]he whole purpose of ending this [CPL-33] contract" was to make BOP employees' "lives better" because the union purportedly had "become[] an obstacle to progress." The CBA "too often slowed or prevented changes" that he wanted to make, and CPL-33 simply was not the "kind of union" he would "support."

7.      BOP's termination of the CBA violated the most basic requirements of reasoned decisionmaking under the APA. BOP did not provide any reasoned explanation for its September 25, 2025 decision to terminate the CBA, effective immediately, months following the EO's issuance. Nor did BOP consider reasonable alternatives, such as allowing the CBA to run at least through its current term. And BOP entirely failed to consider the reliance interests of union members jeopardized by suddenly pulling the plug on union protections upon which members were actively relying.

8.      Supreme Court precedent makes clear that, even if the Executive Order were lawful (a question not raised in this case), and even if BOP was not legally required to maintain a CBA with the union, the agency had to comply with the APA's reasoned decisionmaking requirements in terminating the existing agreement. BOP did not. Its unreasoned and pretextual termination of the CBA was arbitrary and capricious and an abuse of discretion.

9.      The termination also violated the First Amendment. Director Marshall openly stated that, although he once approved of how the union was "advocating for its members," he now believed that its "representation" of members "slowed or prevented changes" that the current administration wants to make, and he terminated the CBA for this reason. The termination thus was retaliation against, and an effort to suppress, the union's perceived speech and associational activities.

3

## JURISDICTION AND VENUE

10.     This Court has jurisdiction under 28 U.S.C. § 1331 because the claims arise under the laws of the United States, and under 28 U.S.C. § 1346(a)(2) because Defendants are a United States agency and official.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because American Federation of Government Employees Council of Prison Locals C-33, AFL-CIO Local 1661 ("Local 1661) is headquartered in Danbury, Connecticut.

## PARTIES

12.     Plaintiff CPL-33 is a labor organization and unincorporated association affiliated with the American Federation of Government Employees (AFGE). It represents a bargaining unit of approximately 30,000 civil servants who work for the BOP. CPL-33 is headquartered in Forrest City, Arkansas and is divided into six geographical regions consisting of more than 100 local unions across the United States.

13.     CPL-33 and the predecessor affiliates from which it evolved have represented employees at federal correctional institutions since the 1940s and were formally recognized as the exclusive representatives of BOP employees as early as 1974. Under its current name, CPL-33 has been the exclusive bargaining representative for BOP employees since 2006.

14.     CPL-33's mission is to advocate for and promote the interests of bargaining unit members in their federal employment, including working for a safe and fair workplace for all members. In its role as the exclusive bargaining representative, CPL-33 has provided many important services to bargaining unit members, including collective bargaining with the agency to obtain a fair and reasonable CBA, filing and negotiating grievances against the agency to enforce the terms and conditions of the CBA, pursuing arbitrations on behalf of workers to

4

enforce the CBA, providing regular trainings to constituent locals, and providing other resources and support to bargaining unit members. One key component of CPL-33's work is representing staff during investigations in response to inmate allegations.

15.    Plaintiff CPL-33, AFGE Local 1661, AFL-CIO ("Local 1661") is the Local of CPL-33 for BOP employees at the Federal Correctional Institution, Danbury. Local 1661's members are covered by the CBA between CPL-33 and BOP.

16.    Defendant BOP is a federal agency with responsibility for the custody and care of federal inmates in facilities around the country. It is a component of the Department of Justice (DOJ).

17.    Defendant William K. Marshall, III, is the Director of BOP and is sued in his official capacity.

## LEGAL AND FACTUAL BACKGROUND

### A.    CPL-33's Current CBA and Other Representational Activity

18.    CPL-33's CBA with BOP was most recently extended on November 1, 2024, for a term running through May 28, 2029.

19.    The CBA guaranteed important BOP worker rights and protections. For instance, the CBA:

      a.    Set important terms and conditions for overtime, sick leave, holidays, and paid time off for workers in the unit;

      b.    Imposed safety and health requirements to ensure the welfare of workers in their place of employment;

      c.    Established protections for workers regarding reduction-in-force actions and procedures;

    d.   Imposed procedures for and limitations on disciplinary and adverse actions against workers;

    e.   Provided for an Employee Assistance Program for individuals who have problems associated with alcohol, drug, marital, family, legal, financial, stress, attendance, and other personal concerns;

    f.   Established grievance and arbitration procedures for employees and CPL-33 to resolve disputes with the agency over employment matters;

    g.   Provided for official time, which allowed bargaining unit employees to perform union representation activities during government time as reasonable and necessary;

    h.   Set hours of work, established seniority of members, and outlined the bidding process for shift work.

20.    The CBA was the product of years of negotiations to safeguard essential rights for bargaining unit members.

21.    One of the most important rights under the CBA is official time. Union representatives use official time to prepare for and participate in arbitrations, workers compensation cases, and other proceedings and negotiations on behalf of workers in the bargaining unit.

22.    CPL-33 is very active in advocating on Capitol Hill regarding matters such as improved working conditions and adequate funding for staff and facilities.

23.    Between March and September of this year, CPL-33 went to Capitol Hill for advocacy activities on six occasions. The focus of the union's advocacy during one of those trips in June was opposition to cuts to employee salary and retirement benefits outlined in the One Big

Beautiful Bill Act. Union representatives have also voiced opposition to these cuts in posts on social media.

**B.    The President Exempts Certain Agencies from the FSLMRS but Does Not Require Termination of CBAs**

24.    On March 27, 2025, President Trump issued Executive Order 14251, which exempted dozens of federal agencies from the requirements of the FSLMRS,[1] purportedly because those agencies had "as a primary function intelligence, counterintelligence, investigative, or national security work" and the FSLMRS could not be "applied to" the agencies "in a manner consistent with national security requirements and considerations." EO 14251, §§ 1(a), 2; *see* 5 U.S.C. § 7103(b).

25.    BOP, including its local offices, is one of the agencies that the President sought to exempt from the FSLMRS's coverage under EO 14251. *See* EO 14251§ 2(b).

26.    Whether EO 14251 was a valid exercise of the President's authority under 5 U.S.C. § 7103(b) is the subject of separate litigation. But even if EO 14251 validly exempted BOP and other agencies from the FSLMRS, it did not state that agencies were compelled to terminate extant CBAs and did not mandate that the CPL-33 CBA be terminated before its expiration date.

27.    Statements from the Administration issued contemporaneously with EO 14251, including from the Office of Personnel Management (OPM), confirm that agencies retained discretion whether to terminate extant CBAs. In a March 27 guidance document, OPM advised agencies to "consult with their General Counsels as to how to implement the President's directive," seemingly recognizing that agencies would not necessarily immediately cancel their

---

[1] *See* chapter 71 of part III, subpart F of title 5 (5 U.S.C. 7101–7135).

CBAs. *See* March 27 Memorandum from OPM Acting Director to Head and Acting Heads of

Agencies and Departments, https://perma.cc/H5SN-T5FZ ("March 27 OPM Guidance")

28.    In early April, shortly after OPM issued its initial guidance, OPM issued an FAQ

advising agencies *not* to terminate any CBAs "until the conclusion of litigation or further

guidance from OPM directing such termination." Frequently Asked Questions, Executive Order

14251, https://perma.cc/38KJ-Z7TN.

**C.    AFGE National Challenges the EO in the Northern District of California**

29.    EO 14251 led to a flurry of litigation. Before the EO was even issued, DOJ and

other federal agencies affirmatively filed suit in the Western District of Texas against CPL-33

and other AFGE councils that represent employees at the agencies targeted by the EO.[2]

30.    With respect to CPL-33, the government lamented in its complaint that the

union's "CBA includes numerous terms that materially restrict the power of DOJ and its

components to govern and set policies for its own workforce."[3] The first example the

government provided had nothing to do with national security, but rather that "the BOP CBA

requires at least nine months of notice to the union before any reduction in force" to mass-

terminate staff may be taken.[4]

31.    The government's complaint made clear that it believed the EO authorized, but

did not require, agencies to terminate existing CBAs. The government asserted that "[b]ecause

Plaintiff agencies have been properly excluded from coverage under 5 U.S.C. Chapter 71 [the

FSLMRS], Plaintiff agencies are free to rescind or repudiate CBAs that were previously

---

[2] *See U.S. Dep't of Def. v. AFGE, AFL-CIO, District 10*, No. 6:25-cv-119, Dkt. No. 1 (W.D. Tex. Mar. 28, 2025).
[3] *Id.* ¶ 144.
[4] *Id.* ¶ 145.

negotiated with Defendants' unions."[5] And the declaratory relief that the government sought was for the court to: "Declare that Plaintiff agencies are authorized to terminate their CBAs pursuant to the Executive Order and OPM's implementing guidance."[6]

32.    The government's lawsuit was dismissed for lack of standing and there is no appeal pending.

33.    In April 2025, AFGE National and other national and international unions brought suit challenging EO 14251 in the Northern District of California.[7]

34.    CPL-33 is not and was not a plaintiff in that action.

35.    The Northern District of California plaintiffs brought only constitutional and ultra vires claims that focused on the legality of the EO, and did not bring any claims under the APA challenging the termination of the CBA for CPL-33, which occurred after the filing of the litigation.

36.    On June 24, 2025, the district court preliminarily enjoined implementation of the EO as to the plaintiffs on First Amendment grounds.[8] However, on August 1, 2025, the Ninth Circuit stayed the district court's injunction.[9]

**D.    BOP Does Not Terminate Its CBA for Nearly Two Months after the Stay, and Takes Actions Consistent with the Terms of the CBA During That Time**

37.    After the Ninth Circuit's stay of the preliminary injunction, BOP did not immediately terminate its CBA with AFGE affiliate CPL-33.

38.    On August 13, following the Ninth Circuit's stay, OPM issued an updated FAQ. The FAQ did not direct agencies to terminate CBAs. Rather, it stated that agencies "*may choose*

---

[5] *Id.* ¶ 175.
[6] *Id.*, Request for Relief.
[7] *AFGE v. Trump*, No. 4:25-cv-3070, Dkt. 1 (N.D. Cal. Apr. 3, 2025).
[8] *AFGE v. Trump*, No. 4:25-cv-3070, 2025 WL 1755442 (N.D. Cal. June 24, 2025).
[9] *AFGE v. Trump*, No. 24-4014 at Dkt. 32 (9th Cir. Aug. 1, 2025).

to terminate, abrogate, or repudiate CBAs with [non-NTEU] unions, and should consult with their General Counsels to assess next steps regarding those CBAs." *See* August 13 OPM FAQ (emphasis added).

39.    BOP did not terminate the CBA with CPL-33 until September 25, 2025.

40.    Instead, between the date of the Ninth Circuit stay and September 25, BOP continued to engage in actions required by the CBA, including by citing various CBA requirements as the basis for its actions.

41.    For example, between August 1 and September 25, the agency continued to hold Labor Management Relations meetings at the local level across the country as anticipated by the CBA. *See* CBA at 4 ("The parties at the national level endorse the concept of regular labor management meetings at the local level. It is recommended that such meetings occur at least monthly, that there be an established method of written minutes, and that there be suspense dates for responses or corrective action.").

42.    These meetings exist as the method for BOP to engage in negotiations with the union as the exclusive representative of the local employees. Indeed, as late as September 23, 2025, the Acting Associate Warden in Morgantown, VA engaged in a meeting with Local 2441 to work through open issues relating to local staff as anticipated by the CBA.

43.    In addition, through the end of September 2025, BOP continued to notify employees of their right to union representation in disciplinary meetings and interviews, as required by the CBA and in line with the union acting as the exclusive representative of local staff.

44.    And the agency continued to negotiate with the union directly on a variety of issues, treating the agreement as in effect and governing the agency's day-to-day work in those

instances. In an August 19, 2025 agreement with one local, for example, the agency recognized that the union "is the certified representative of all current and former bargaining unit employees."

45.    During the August-September 2025 period, the agency engaged with the union and took numerous actions consistent with its obligations under the CBA—it sought union input on staffing plans, approved official time for union representatives to engage in activities under the CBA, and provided program statements for union review.

46.    A key aspect of CPL-33's CBA is that it governs the union's role and process for grievance proceedings. During this time, the agency responded to numerous grievances brought under the terms of the CBA and reached agreements with the union to settle grievances that were filed.

47.    And demonstrating the union's continued and significant role, the agency even continued to include union representatives in senior meetings across the agency.

48.    BOP did not even take steps during this timeframe to dismantle or reduce the union's footprint within some BOP facilities. BOP maintained designated space on-site for union activities and left posters on its walls to notify employees about their collective bargaining rights.

**E.    BOP Terminates the CBA Because CPL-33 Is Not a Union that the Director "Supports"**

49.    On September 25, 2025, with no advance notice to the union, Defendant Marshall abruptly terminated the agency's CBA with CPL-33.

50.    That day, Marshall sent a formal letter to CPL-33 stating that, "based on [EO 12451] and as of the date of this notice, [BOP] no longer recognizes [CPL-33] as the exclusive representative for employees of the existing bargaining unit." Marshall added: "As a result, the following actions, among others, consistent with this decision are being taken." Marshall then

listed four actions being taken. First, Marshall was terminating the CBA and other agreements between BOP and CPL-33. Second, Marshall wrote that union dues would no longer be deducted from employees' pay. Third, union officials could no longer request or be granted official time pursuant to the FSLMRS or any CBAs. Fourth, employees no longer had the right to union representation at formal discussions, investigatory interviews, third party proceedings or in any other situation.

51.      The letter did not explain how BOP's decision was, in fact, "based on" EO 14251. The letter did not state that terminating the CBA was required by the EO at that time—nor could it. The letter also did not provide any explanation of why termination was necessary to effectuate the purported purposes of the EO, and it certainly did not provide any reason for terminating the CBA "effective immediately.".

52.      The same day Marshall sent this letter, he posted a "Message from the Director" on BOP's website (the "Message"). The Message revealed BOP's true reasons for terminating the CBA. It read, in full:

> For too long, the Federal Bureau of Prisons has been ranked among the worst places to work in the federal government. That's unacceptable and that demands change.
>
> My commitment is clear: make life better for every person who works here. Better conditions. Better policies. A better future.
>
> CPL-33 has a proud history of advocating for its members, and I want to acknowledge the positive contributions it has made over the years. Many dedicated people have given their time and energy under this contract, and I respect the intent behind that work. But the truth is, despite those efforts, we have not seen the progress we need. The current contract has too often slowed or prevented changes that would have made your jobs safer and your workdays better. This is not about questioning the value of representation; it's about ensuring representation moves us forward, not holds us back.
>
> I grew up in West Virginia. My family has always been pro-union. The coal miners and steel workers I knew stood together, fought for safer conditions, and

made life better for their families. That's the kind of union I will always support. But when a union becomes an obstacle to progress instead of a partner in it, it's time for change. And today, thanks to President Donald J. Trump and Attorney General Pamela Bondi, we're making that change. Today, I'm announcing the termination of our contract with CPL-33 effective immediately.

I want to be absolutely clear about what this means.

- Your job security is protected by civil service law. You will not be removed, suspended, or demoted without cause and due process.

- Your pay and benefits, including your salary, retirement, health insurance, overtime, leave accrual, and uniform allowance, are guaranteed by law and remain.

- Your civil service protections, including whistleblower rights, appeal rights, and anti-discrimination protections, remain fully in place.

- Your safety remains my priority. Our legal obligation to provide a safe and secure workplace does not change.

In the coming days, we will spell out exactly how we move forward from here but the bottom line is CPL-33 didn't give you your protections, the law did, and Bureau policy continues them.

Those safeguards aren't going anywhere. This isn't about taking things away, it's about giving you more. More clarity. More fairness. More respect.

The whole purpose of ending this contract is to make your lives better. Period.

Every time I change an old practice, I'm asking one question first: Does this make life better for my staff? If the answer is no, it doesn't happen. If the answer is yes, we move and we move fast.

We will move forward with solutions that work, without roadblocks, without excuses, and with one goal: to make the Bureau a place where people are proud to serve.

This is our moment to build something better. And we will. Now, let's get to work.

William K. Marshall, III
Director
Federal Bureau of Prisons

53.    Marshall thus made clear that BOP did not terminate the CBA because the EO required doing so, or even to carry out the EO's purported purpose of protecting national security.

54.    Rather, "[t]he whole purpose of ending this contract [was] to make [employees'] lives better," because the union purportedly had "become[] an obstacle to progress instead of a partner in it," and it was "time for change." According to Marshall, "[t]he current contract has too often slowed or prevented changes." Marshall claimed he was "pro-union," but CPL-33 was not "the kind of union" he "support[ed]."

55.    Following the termination of the CBA, CPL-33 representatives and bargaining unit employees have become even more hesitant than they were already to engage in activity that is or could be perceived as being contrary to policies of the Trump Administration.

## CAUSE OF ACTION

### COUNT ONE
### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious Agency Action

56.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

57.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

58.    BOP's termination of the CPL-33 CBA constitutes final agency action under the APA.

59.    In numerous ways, BOP's termination of the CPL-33 CBA was arbitrary, capricious, and an abuse of discretion.

14

60.    BOP failed to meet the most basic requirement of reasoned decisionmaking under the APA, which is to provide a reasoned explanation for its action. BOP did not explain why it was exercising its discretion to terminate the CBA following issuance of the EO. BOP did not explain why it was terminating the CBA on September 25, 2025, six months after the EO and nearly two months after the Ninth Circuit stayed the preliminary injunction that had been in effect. And BOP did not explain why it was terminating the CBA effective immediately, and not at a later date or when the existing CBA was set to expire. BOP did not provide any explanation at all on these fronts, let alone the "satisfactory explanation" that the APA requires. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

61.    BOP also failed to consider "alternatives" to its action. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). It did not consider, for example, delaying the effective date of the termination or allowing the CBA to run at least through the expiration of its term, if not longer.

62.    BOP also failed to consider the "serious reliance interests" of BOP employees who rely on the CBA and the protections and procedures it provided. *Regents*, 591 U.S. at 30. In terminating the CBA effective immediately, BOP did not consider, for example, the reliance interests of employees impacted by pending union grievances, or who face investigations in which the employee receives union representation or other support. BOP also did not consider the reliance interests of employees with safety concerns that were addressed in quarterly Labor Management Meetings with the union or through informal and formal grievance processes. BOP also did not consider the reliance interests of employees and the union in receiving timely rulings through the use of grievance processes.

63.    BOP's termination is also arbitrary and capricious because there is a "disconnect between the decision made and the explanation given." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). "The reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* "Accepting contrived reasons would defeat the purpose of the enterprise." *Id.*

64.    Here, BOP's official explanation in its September 25 termination letter was that it was terminating the CBA "based on the EO," presumably meaning based on the EO's national security rationale. But the Director's Message of that same day revealed that the agency, in fact, terminated for an entirely different reason: "the whole purpose of ending this contract [was] to make [employees'] lives better" because the union purportedly had "become[] an obstacle to progress instead of a partner in it."

65.    Because BOP provided a "contrived reason" for its termination of the CBA, the termination is arbitrary and capricious and an abuse of discretion.

**COUNT TWO**
**First Amendment**
**Contrary to Constitution Right, 5 U.S.C. § 706(2)(B)**

66.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

67.    The First Amendment prohibits government officials from retaliating against individuals and organizations based on their protected speech or perceived First Amendment activities, including protected speech and association. The First Amendment also prohibits the government from seeking to suppress actual or perceived speech or association based on disagreement with the speaker's viewpoint.

68.     The Director's "Message" posted the same day as the CBA termination indicates that the termination reflected retaliation against, and an effort to suppress, the speech and associational activities of CPL-33 and its members. In the wake of CPL-33 advocating before Congress against legislation that the administration supported, the Director wrote that the union's "advocating for its members" no longer advanced BOP's interests. According to the Message, Marshall terminated the CBA because the union was "an obstacle to progress," having "slowed or prevented changes" and created "roadblocks."

69.     The Director thus terminated the CBA because of the union's perceived speech and associational activities, and the Director's effort to prevent those activities from "hold[ing] BOP back" going forward.

70.     The termination violated the First Amendment in retaliating against and seeking to suppress protected speech and associational activities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A.     Declare unlawful, vacate, and set aside Defendants' unlawful rescission of Plaintiff's CBA as arbitrary and capricious, an abuse of discretion, and unlawful under the First Amendment;

B.     Enter a preliminary and permanent injunction prohibiting Defendants from effectuating the September 25, 2025 termination of CBA;

C.     Award Plaintiff reasonable attorneys' fees and costs; and

D.     Grant such other and further relief as this Court may deem just and proper.

Dated: November 13, 2025

Respectfully submitted,

By: */s/ Logan J. Place*
Logan J. Place (ct31874)
Livingston, Adler, Pulda, Meiklejohn &
Kelly, P.C.
557 Prospect Avenue, 2nd Floor
Hartford, CT 06105
(860) 233-9821
ljplace@lapmk.org


Daniel F. Jacobson (D.C. Bar 1016621)*
Lynn D. Eisenberg (D.C. Bar 1017511)*
Kyla M. Snow (D.C. Bar 90036400)*
Brian Rosen-Shaud (ME Bar 6018)*
Jacobson Lawyers Group PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(301) 823-1148
dan@jacobsonlawyersgroup.com

*Application *pro hac vice* forthcoming


*Counsel for Plaintiffs*