**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NATIONAL COUNCIL OF PRISON LOCALS et al., | : | No.: 3:25cv1907 (VDO) |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| FEDERAL BUREAU OF PRISONS et al., | : | |
| Defendants. | : | February 13, 2026 |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION**
**TO DISMISS OR, IN THE ALTERNATIVE, TO STAY, AND**
**OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

DAVID X. SULLIVAN
UNITED STATES ATTORNY

J.BRIAN MESKILL
Assistant United States Attorney
450 Main Street, Rm. 328
Hartford, CT 06103
T: (203) 821-3700
F: (203) 773-5373
Brian.Meskill@usdoj.gov

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................................. 1

II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY ...................................... 3

    A.  The FSLMRS and related Executive Orders ............................................................... 3

    B.  The BOP's mission...................................................................................................... 6

    C.  Litigation involving EO 14,251................................................................................... 6

    D.  The BOP's implementation of EO 14,251 .................................................................. 8

    E.  The instant action and Plaintiff's motion for preliminary injunction........................... 8

III. LEGAL STANDARDS AND FRAMEWORK.................................................................... 8

    A.  Motion to Dismiss ...................................................................................................... 8

        1.   12(b)(1) ............................................................................................................... 8

        2.   12(b)(6) ............................................................................................................... 9

    B.  5 U.S.C. § 705 and preliminary injunctions ............................................................... 9

IV. ARGUMENT...................................................................................................................... 11

    A.  The Court must dismiss this case ................................................................................ 11

        1.   The Court lacks subject matter jurisdiction over this lawsuit............................... 11

            a.   The Thunder Basin exception is not applicable here ................................. 13

            b.   Plaintiffs have other adequate remedies in court...................................... 18

        2.   This Court should dismiss this action as impermissible claim splitting ........... 18

        3.   The Complaint alternatively should be dismissed for failure to state a claim .. 23

            a.   Count One ................................................................................................ 23

                i.    BOP's cancellation of the CBA was rational.................................... 23

                ii.   The APA bars judicial review of discretionary action....................... 27

                iii.  The Director's termination letter was not pretextual ........................ 28

            b.   Count Two – BOP's actions are not First Amendment retaliation.......... 29

                i.    The decision to cancel the CBA was not retaliatory.......................... 29

                ii.   Any viewpoint discrimination claim also fails ................................. 30

    B.  The Court should stay the case or transfer venue ....................................................... 32

    C.  The motion for preliminary injunction should be denied ........................................... 32

        1.   Plaintiffs are unlikely to succeed on the merits of their APA claim ............... 33

            a.   APA review is unavailable due to potential alternative remedies .......... 33

            b.   The Director did not act arbitrarily and capriciously............................. 34

        2.   Plaintiffs cannot show irreparable harm absent a preliminary injunction....... 34

        3.   The balance of the equities and the public interest favor the BOP ................. 37

    D.  Any injunction should be accompanied by a bond...................................................... 39

V.   CONCLUSION................................................................................................................... 40

Pursuant to Local Civil Rule 7(a)(1), the Federal Bureau of Prisons ("BOP") and William K. Marshall III, in his official capacity as Director of the BOP, respectfully submit this memorandum in support of their motion to dismiss or, in the alternative, to stay the case, and opposition to Plaintiffs' motion for a preliminary injunction, ECF No. 28.

## I.    INTRODUCTION

The Federal Service Labor-Management Relations Statute ("FSLMRS") authorizes the President to exempt from its coverage "*any* agency or subdivision thereof" if the President makes the determination that (A) "the agency . . . has as a primary function intelligence, counterintelligence, investigative, or national security work," and (B) the provisions of the statute "cannot be applied to that agency . . . in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1) (emphasis added). Like most Presidents before him, on March 27, 2025, President Trump issued such an order. Specifically in Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* ("the EO"), the President made the required determinations, thereby excluding from statutory coverage the identified agencies and agency subdivisions including, as relevant here, the Department of Justice ("DOJ"), which includes the BOP.

On September 25, 2025, the Director of the BOP notified Plaintiff National Council of Prison Locals, American Federation of Government Employees ("CPL-33") that "[a]s a result" of "the President's broad authority under 5 U.S.C § 7103(b)(l) to exempt agencies" including the DOJ—and "based on the EO [14,251]"—the  BOP "no longer recognizes [CPL-33] as the exclusive representative for employees of the existing bargaining unit." ECF No. 28-5. Consequently, the BOP terminated the Collective Bargaining Agreement ("CBA") that governed

1

the relationship between it and the union, a decision which flowed directly from the EO (which Plaintiffs do not directly challenge in this suit).

Plaintiffs, CPL-33 and Local 1661, then waited months to file their Complaint on November 13, 2025. *See* ECF No. 1 ("Compl."). In their Complaint, Plaintiffs advance two causes of action. First, they argue that the BOP's ending of the CBA between the BOP and CPL-33 was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Compl. ¶¶ 56–65. Second, Plaintiffs argue that the BOP decision was in violation of the APA, 5 U.S.C. § 706(2)(B), because it represented impermissible retaliation in violation of the First Amendment. Compl. ¶¶ 66–70. For relief, Plaintiffs request, *inter alia*, that this Court enter a permanent injunction prohibiting Defendants from effectuating the termination of "Plaintiff's CBA." *See* Compl., p. 17. Still later, on December 22, 2025, Plaintiffs filed their preliminary injunction motion. *See* Motion for Prelim. Inj., ECF No. 28 ("PI Motion").

As it must, the Court should first determine whether it has jurisdiction over this action. In doing so, it will become apparent to the Court that the case should be dismissed because the Court lacks subject-matter jurisdiction as Congress has channeled the dispute Plaintiffs raise in this case to the Federal Labor Relations Authority ("FLRA"). The Court alternatively should dismiss this case for impermissible claim splitting of a previously filed action in the Northern District of California (currently on appeal to the Ninth Circuit) or for failure to state a claim.

If the Court does not dismiss this action, it should alternatively stay the case pending the outcome of the litigation in California or transfer it to the District Court for the District of Columbia ("D.D.C.") for the convenience of parties and witnesses, and in the interest of justice. Defendants, by separate motion, are simultaneously moving to transfer venue to D.D.C. Finally, if the Court reaches the merits of the PI motion, Plaintiffs cannot demonstrate that they meet *any* of

the elements to warrant preliminary injunctive relief. First, Plaintiffs cannot make a strong showing that they are likely to succeed on the merits as the agency's action involved implementing discretionary authority committed to the President. Second, Plaintiffs cannot show irreparable injury absent injunctive relief, as their alleged injuries could be remedied upon a favorable ruling by the FLRA's (or a federal court if the Court determines that these claims are not channeled) broad authority to issue remedial relief. Pursuing injunctive relief several months after the cancellation of the CBA also undercuts any argument that harm is imminent. Finally, as recognized by two courts of appeals in other EO 14,251-related litigation, there is a greater likelihood that Defendants will suffer irreparable harm if Plaintiffs' request for preliminary relief is granted because it would "tie[] the government's hands … in the national security context." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,* 148 F.4th 648, 656 (9th Cir. 2025) ("AFGE II") (quoting *Natl Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) ("NTEU")).

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  The FSLMRS and related Executive Orders

Before Congress enacted the FSLMRS, the President routinely "regulate[d] labor relations in the federal government and internal matters of unions representing federal government employees . . . " by executive order. *Local 1498 v. AFGE, AFL/CIO*, 522 F.2d 486, 491 (3d Cir. 1975); *see also Serv. Emps. Int'l Union Loc. 200 United v. Trump*, 420 F. Supp. 3d 65, 68 (W.D.N.Y. 2019) ("*SEIU I*"). The Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America," U.S. Const. art. II, § 1, cl. 1, and this power includes the authority to make "improvement[s] in the efficiency of federal employment." *Manhattan-Bronx Postal Union v. Gronouski*, 350 F.2d 451, 456 (D.C. Cir. 1965).

3

President Kennedy took the first formal measure to regulate federal-sector labor relations in 1962 when he issued Executive Order No. 10988, *Employee-Management Cooperation in the Federal Service*, 27 Fed. Reg. 551 (Jan. 17, 1962). *See Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 91–92 & n.2 (1983) ("*ATF*"). Multiple Presidents subsequently amended that Order. [1] In 1978, against this framework, Congress passed the FSLMRS. This statute—enacted as Title VII of the Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 and codified at 5 U.S.C. §§ 7101 *et seq*—provides a "comprehensive . . . scheme governing labor relations between federal agencies and their employees." *ATF*, 464 U.S. at 91. The FSLMRS establishes the right of certain federal employees to form or join a labor union, among other protections. However, the statute exempts certain agencies and matters from its coverage. *See, e.g.*, 5 U.S.C. § 7103(a)(3) (excluding from coverage, *inter alia*, the Government Accountability Office and the Federal Bureau of Investigation); 5 U.S.C. § 7103(a)(12), (14) (defining "collective bargaining," in part, as a good-faith effort to reach agreement with respect to "conditions of employment"—a separately defined term that excludes "policies, practices, and matters relating to the classification of any position"). The FSLMRS also empowers the President to exempt additional agencies and their subdivisions from its requirements. Specifically,

> The President may issue an order excluding *any* agency or subdivision thereof from coverage under [the Statute] if the President determines that—(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and (B) the provisions of [the Statute] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

---

[1] *See, e.g.,* Exec. Order No. 11,491, *Labor-Management Relations in the Federal Service*, 34 Fed. Reg. 17,605 (Oct. 29, 1969), as amended by Exec. Order No. 11,616, 36 Fed. Reg. 17,319 (Aug. 26, 1971), Exec. Order No. 11,636, 36 Fed. Reg. 24,901 (Dec. 17, 1971), and Exec. Order No. 11,838, 40 Fed. Reg. 5,743 (Feb. 6, 1975).

*Id.* § 7103(b)(1) (emphasis added). "Section 7103(b)(1) makes clear that the President may exclude an agency from the Act's coverage whenever he 'determines' that the conditions statutorily specified exist." *AFGE v. Reagan.,* 870 F.2d 723, 727 (D.C. Cir. 1989) ("AFGE v. Reagan"); *see also id.* (further noting the "section does not expressly call upon the President to insert written findings into an exempting order, or indeed to utilize any particular format for such an order").

Pursuant to this authority, President Carter issued an executive order in 1979 excluding more than forty-five agencies or agency subdivisions from FSLMRS coverage, which precluded their employees from collective bargaining. *See* Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 19, 1979) (exempting, *inter alia*, the Information Security Oversight Office for the General Services Administration and the Federal Research Division of Research Services for the Library of Congress). Every President since, except President Biden, has issued similar executive orders expanding that list in response to changing circumstances and the evolving, complex national security responsibilities of federal agencies.[2]

On March 27, 2025, President Trump issued EO 14,251, which directly led to the CBA termination that Plaintiffs challenge here. In Sections 1 and 2 of the EO, the President determined that certain agencies—including the DOJ—"have as a primary function intelligence, counterintelligence, investigative, or national security work, and that the FSLMRS cannot be applied to those agencies and subdivisions in a manner consistent with national security requirements and considerations." *Id.* §§ 1, 2(c). And while the EO contained a carve-out for "the immediate, local employing offices of any agency police officers, security guards, or firefighters" the exclusion "does not apply to the Bureau of Prisons." EO 14,251, § 2(b).

---

[2] *See, e.g.*, Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997); Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 7, 2002); Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,760, 82 Fed. Reg. 5,325 (Jan. 17, 2017).

### B. The BOP's mission

As the President properly determined, the DOJ has national security work as a primary function. *See* Exec. Order 14,251 §§ 1–2. As part of the DOJ, the BOP protects national security and community public safety by ensuring that federal offenders (including those international terrorists and foreign threats investigated and convicted by other DOJ components) serve their sentences of imprisonment in facilities that are appropriately secure, humane, and cost-efficient. *See* Hemingway Decl., ¶ 16.b. Among the inmates maintained in the BOP's custody are terrorists responsible for the 9-11 attacks; international spies; Nicolás Maduro; and international drug trafficker Joaquín "El Chapo" Guzmán. *See id.*, ¶¶ 16.b.–c. The BOP monitors inmate communications to detect public safety threats, conducts internal investigations, and serves as a member of both the National Joint Terrorism Taskforce and the Federal Bureau of Investigation ("FBI") Joint Terrorism Task Force to combat terrorism on a national and international scale. *See id.*, ¶¶ 16.b.–e. The BOP's Correctional Programs Division includes the Intelligence and Counter Terrorism Branch which monitors and analyzes domestic and international terrorist-related intelligence and information, providing operational intelligence. *See id.*, ¶ 16.d. These efforts have resulted in, for example, the conviction of an individual affiliated with ISIS. *See id.*

Additionally, most BOP employees work in prisons and are, therefore, designated as federal law enforcement officers, regardless of individual position or title. *See id.*, ¶ 2. The BOP has been instrumental in assisting the Department of Homeland Security ("DHS") in its effort to arrest, detain, house, and deport individuals who enter the United States illegally. *See* Hemingway Decl., ¶ 15.f. The BOP also actively supports national, state, and local emergency management efforts by providing resources and personnel as needed. *See id.*

### C. Litigation involving EO 14,251

After the President signed EO 14,251, numerous unions filed suit challenging its validity.[3] *See* Hemingway Decl., ¶¶ 10–11. One such suit names the DOJ and Attorney General directly. *See Am. Fed. of Gov't Emps. v. Trump*, No. 4:25cv3070, ECF No. 1 (N.D. Cal. June 24, 2025) ("*AFGE II*"); *see also* Hemingway Decl., ¶11. The lead plaintiff in *AFGE II* is the American Federation of Government Employees ("AFGE"), the parent organization of the union Plaintiffs here. *Id.* In *AFGE II*, the Ninth Circuit stayed a preliminary injunction seeking, as Plaintiffs do here, to prevent the BOP from implementing the EO. *AFGE II*, 148 F.4th at 648. Last month, the Ninth Circuit held oral argument on the preliminary injunction appeal. *AFGE II*, No. 25-4014, ECF No. 80 (9th Cir. Jan. 12, 2026).

Additionally, two cases filed in the D.D.C.—albeit by plaintiffs unrelated to the unions in this case—involve substantially the same issues as those involved here, and the D.C. Circuit has stayed preliminary injunctions issued by the district court pending appeal in the Circuit.[4] The D.C. Circuit held oral argument this past December on the appeals in those cases along with a third, related case calendared the same day before the same panel.[5] Still other cases in D.D.C. are stayed pending the outcome of that appeal[6]

---

[3] *See, e.g.*, *Am. Fed. of Labor & Congress of Indus. Orgs. v. Trump*, No. 1:25-cv-2445, ECF No. 1 (D.D.C. Jul. 29, 2025); *Am. Foreign Serv. Assoc. v. Trump*, No. 1:25cv01030, ECF No. 1 (D.D.C. Apr. 7, 2025); *Am. Fed. of Gov't Emps. v. Trump*, No. 3:25cv3070, ECF No. 1 (N.D. Cal. Apr. 3, 2025); *Fed. Educ. Assoc. v. Trump*, No. 1:25cv01362, ECF No. 1 (D.D.C. May 5, 2025); *Nat'l Treasury Emps. Union v. Trump*, No. 1:25cv00935, ECF No. 1 (D.D.C. Mar. 31, 2025).

[4] *AFSA v. Trump*, No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025), *reh'g en banc denied* (July 30, 2025) ("*AFSA II*"); *NTEU*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025), *reh'g en banc denied* (July 16, 2025).

[5] *See Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626 (D.C. Cir. Sept. 25, 2025 ("FEA") (denying stay).

[6] *See AFL-CIO v. Trump*, 1:25-cv-2445 (D.D.C.); *NAAE v. Trump*, 1:25-cv-2657 (D.D.C.); *NWSEO v. Trump*, 1:25-cv-2947 (D.D.C.); *NTEU v. Trump*, 1:25-cv-2990 (D.D.C); *AFSCME, AFL-CIO v. Trump*, 1:25-cv-3306 (D.D.C); *IBEW v. Trump*, 1:25-cv-03826 (D.D.C.); *IFPTE v. Trump*, 1:25-cv-03615.

7

### D. The BOP's implementation of EO 14251

Due to litigation surrounding implementation of the EO and then-guidance from the Office of Personnel Management ("OPM") the BOP awaited clarity before taking action to end the CBA with CPL-33. *See id.,* ¶ 12. After OPM issued revised guidance on September 10, 2025, and based on the status of *AFGE II*, Director Marshall decertified CPL-33 and terminated the CBA pursuant to the EO. *See id.,* ¶ 15.

### E. The instant action and Plaintiffs' motion for preliminary injunction

On November 13, 2025, Plaintiffs filed this action. *See* Compl., ECF No. 1.  On December 22, 2025—88 days after the BOP notified CP-33 that it was ending the CBA and over a month after filing their Complaint—Plaintiffs filed their PI motion. *See* PI Motion, ECF No. 28. Therein, Plaintiffs argue they are likely to succeed on the merits of Count One, *i.e.* that the BOP's termination of the CBA was arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A). *See* Memorandum in Support of PI Motion, ECF No. 28-1, p. 17 ("PI Memo"). Plaintiffs *do not* raise their First Amendment retaliation claim as grounds for their PI Motion. *See id*.

As relief, Plaintiffs request the Court to stay and preliminarily set aside Defendants' termination of the CBA. *See* PI Motion, ECF Nos. 28 and 28-7. Following a conference, the Court entered a scheduling order that set the deadline for Defendants' responsive pleadings and response to the PI Motion as February 13, 2026.  *See* ECF Nos. 33, 38.

### III. LEGAL STANDARDS AND FRAMEWORK

#### A. Motion to dismiss

##### 1. 12(b)(1)

On a motion to dismiss under Rule 12(b)(1), the Court is required to dismiss any claim over which it lacks subject-matter jurisdiction. As federal courts are courts of limited jurisdiction,

8

the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The party invoking the Court's jurisdiction bears the burden of proving that subject-matter jurisdiction exists. *See, e.g., Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). "When the Rule 12(b)(1) motion is facial, '*i.e.*, one "based solely on the allegations of the complaint or the complaint and exhibits attached to it," plaintiffs have no evidentiary burden, for both parties can be said to rely solely on the facts as alleged in the plaintiffs' pleading.'" *Doe v. United States*, No. 3:24cv1146 (VDO), 2025 WL 2740575, at *4 (D. Conn. Sept. 26, 2025) (quoting *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017)).

### 2. 12(b)(6)

"A party may move to dismiss a complaint for 'failure to state a claim upon which relief can be granted[.]'" *Doe*, 2025 WL 2740575, at *4 (quoting FED. R. CIV. P. 12(b)(6)). Upon such a motion, a court takes a complaint's factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009).

"As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504 (2d Cir. 2019) (quotation omitted). "Claim splitting may be grounds for dismissal under Rule 12(b)(6)" and "[a]lthough a motion premised on claim-splitting requires a court to consider facts beyond the complaint, a court may take judicial notice of facts from a prior judicial proceeding so long as the affirmative defense does not raise a disputed issue of fact." *Kashyap, LLC v. Nat. Wellness USA, Inc.*, No. 11cv0459, 2011 WL 2462192, at *3 (D. Md. June 16, 2011) (citations omitted).

### B. 5 U.S.C. § 705 and preliminary injunctions

9

Plaintiffs move for both a preliminary injunction under Federal Rule of Civil Procedure 65 and a stay of administrative proceedings under 5 U.S.C. § 705. *See* PI Motion. "The standard for a stay under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction." *New York v. United States Dep't of Educ.*, 477 F. Supp. 3d 279, 294 (S.D.N.Y. 2020) (citing *Bauer v. DeVos*, 325 F. Supp. 3d 74, 104-05 (D.D.C. 2018)).

"The authority to issue an injunction is an extraordinary and powerful one that is to be used sparingly and cautiously and only in a clear and plain case." *Cerilli v. Quiros*, No. 24cv1163 (VDO), 2025 WL 47536, at *2 (D. Conn. Jan. 8, 2025) (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 198 (2d Cir. 2007) (internal quotation marks omitted); *see also We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir.), *opinion clarified,* 17 F.4th 368 (2d Cir. 2021); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As such, "[p]reliminary injunctive relief 'should not be routinely granted.'" *We The Patriots USA, Inc.,* 17 F.4th at 279 (quoting *Hanson Tr. PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985)). "When deciding whether to issue a preliminary injunction, courts 'should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Id.* (quoting *Winter*, 555 U.S. at 24).

As Plaintiffs seek the preliminary injunction, they bear the burden of demonstrating entitlement to that relief. *See, e.g., Rodriguez v. Barr*, No. 20cv06227, 2020 WL 13554812, at *2 (W.D.N.Y. Apr. 20, 2020); *Jones v. Schortman*, No. 22cv1512 (VDO), 2024 WL 449612, at *1 (D. Conn. Feb. 5, 2024). To obtain a preliminary injunction, Plaintiffs "must demonstrate 'that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 24; *see also Zesty Paws LLC v. Nutramax Lab'ys, Inc.*, 157 F.4th 194, 197 (2d Cir. 2025); *Jones*, 2024 WL 449612, at *1."[T]o obtain mandatory

preliminary injunctive relief against a government actor, plaintiff must, *inter alia*, 'make a strong showing of irreparable harm' absent injunctive relief and "demonstrate a clear or substantial likelihood of success on the merits'" *Jones*, 2024 WL 449612, at *1 (quoting *Hester ex rel. A.H. v. French*, 985 F.3d 165, 176 (2d Cir. 2021)).  Additionally, the third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

IV.    **ARGUMENT**

    **A. The Court must dismiss this case**

        **1.    The Court lacks subject matter jurisdiction over this lawsuit**

Congress has channeled Plaintiffs' claims here to the FLRA. The Court therefore lacks subject-matter jurisdiction over this action and, consequentially, the authority to grant or deny a preliminary injunction. *See, e.g., Wilson v. State Farm Fire & Cas. Co.*, 690 F. App'x 48, 49 (2d Cir. 2017) (summary order) (vacating denial of preliminary injunction "on the ground that the District Court lacked subject-matter jurisdiction to grant or deny a preliminary injunction."). As such, the Court should dismiss the Complaint.

The FSLMRS "establishes a scheme of administrative and judicial review" for labor relations disputes between the Executive Branch and unions representing federal employees. *AFGE v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*AFGE I*"). That scheme is the exclusive avenue for raising and adjudicating legal challenges within its scope. *Id.* at 755; *see also SEUI I*, 420 F. Supp. 3d at 72–73 (finding it appropriate to adopt the conclusions of *AFGE I* in the absence of any contrary authority from the Second Circuit, and concluding "[t]o the extent Plaintiffs' APA claims challenge the content of the Executive Orders and related Guidances, they are not cognizable in this Court . . . It is well-established that the FLSMRS establishes a review mechanism that is exclusive for claims falling within its scope."). Thus, if a dispute is of the type Congress

11

intended to fall within the ambit of the FSLMRS's special scheme, an aggrieved union is confined to that scheme and cannot proceed instead, or in parallel, with an action in district court. *AFGE I*, 929 F.3d at 754; *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023). A district court presented with such a dispute lacks subject-matter jurisdiction and must dismiss the case. *See AFGE I*, 929 F.3d at 754; *Axon*, 598 U.S. at 185.

Under the FSLMRS, the FLRA is the exclusive entity charged with reviewing covered disputes in the first instance. *See, e.g.*, *AFGE I*, 929 F.3d at 752; *NTEU v. Trump*, No. 74-2181, 2025 WL 561080, at *4 (D.D.C. Feb. 20, 2025). Judicial review of the FLRA's decisions is thereafter available in the courts of appeals. *Id.*; 5 U.S.C. § 7123(a); *see also SEIU I*, 420 F. Supp. 3d at 69. When hearing a petition for review of an FLRA decision, the courts of appeals may review broad statutory and constitutional claims even if the FLRA lacked the authority to consider such claims in its proceedings. *AFGE I*, 929 F.3d at 759.

Here, Plaintiffs do not challenge the EO (as AFGE has in other litigation) but rather Director Marshall's decision to cancel the CBA with CPL-33, either because it was arbitrary and capricious under Count One or impermissible retaliation under Count Two. *See* Complaint ¶¶ 7, 9. That challenge is *plainly* the type of dispute Congress channeled to the FLRA. Plaintiffs could file national grievances over the termination of the CBA or specific provisions or other unfair labor practice ("ULP") grievances.[7] Even beyond those grievances, Plaintiffs could file a case with the

---

[7] In the FSLMRS, Congress established a dedicated review scheme for resolving federal labor disputes by providing multiple channels for a union to challenge conduct it alleges violates the FSLMRS. For example, an employee or a union may file a "charge" with the FLRA alleging that an agency has engaged in an unfair labor practice, which can include, *inter alia*, a failure to negotiate in good faith or comply with any FSLMRS provision. *See* 5 U.S.C. §§ 7116, 7118(a)(1); 5 C.F.R. §§ 2423.3–2423.6. The FLRA's General Counsel "shall investigate" any such charge and may file a complaint against the agency before the FLRA. 5 U.S.C. § 7118(a)(1)– (2); *see also id.* § 7104(f)(2). Alternatively, an employee or union may file a "grievance" to challenge violations of CBAs or to pursue "any claimed violation,

12

FLRA seeking clarification of "a matter related to representation." 5 U.S.C. § 7111(b)(2). Indeed, Plaintiffs could obtain FLRA review of its challenge to the termination of the CBA simply by filing such a petition with the FLRA and seeking to clarify their right to represent employees at the BOP. If the FLRA dismissed the petition by, for example, citing its lack of jurisdiction given the EO, that would result in a "final order" of the FLRA appealable to a court of appeals. 5 U.S.C. § 7123(a); *see also Eisinger v. FLRA*. 218 F.3d 1097, 1102 (9th Cir. 2000).

In sum, the FLRA's review scheme "provides the exclusive procedures by which federal employees and their bargaining representatives may assert federal labor-management relations claims" and unions "cannot circumvent this regime by instead bringing a suit in district court." *AFGE v. Sec'y of Air Force*, 716 F.3d 633, 637–38 (D.C. Cir. 2013); *see also Serv. Emps. Int'l Union Loc. 200 United v. Trump*, 419 F. Supp. 3d 612, 624 (W.D.N.Y. 2019), *aff'd,* 975 F.3d 150 (2d Cir. 2020) ("*SEIU II*") ("[C]laims were subject to mandatory litigation before the FLRA in the context of concrete bargaining disputes."). Accordingly, this Court lacks jurisdiction to review Plaintiffs' claims alleging that the BOP has acted contrary to law by terminating the CBA for BOP employees.

### a. The *Thunder Basin* exception is not applicable here

There is an exception to the channeling requirement, but it does not apply here. Under that exception, channeling is not required when the claim is not "of the type Congress intended to be reviewed within [the] statutory structure." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994). The *Thunder Basin* factors, which determine whether district court review nevertheless is available despite a statutory review scheme, compel that conclusion. *See Axon*, 598 U.S. at 186

---

misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment[.]" *Id.* § 7103(a)(9)(C)(ii); *see also id.* § 7121.

(quoting *Thunder Basin*, 510 U.S. at 212–13). Those factors are: (1) the existence of meaningful relief without district court review, (2) whether a claim is "wholly collateral" to the statute's review scheme, and (3) the relevance of agency expertise. *Id.*

First, a finding of preclusion of district court jurisdiction here would not foreclose meaningful judicial review of Plaintiffs' claims. Plaintiffs can bring their claims before the FLRA, and any arguments that the FLRA cannot resolve (even on jurisdictional grounds) will be addressed by a circuit court of appeal through the FSLMRS's exclusive statutory review process. *See* 5 U.S.C. § 7123(a); *AFGE I*, 929 F.3d at 759; *Sec'y of Air Force*, 716 F.3d at 637–40 (describing "multiple paths" within the FSLMRS's "exclusive remedial regime" through which a union can obtain FLRA and then federal circuit court review); *see also SEIU II*, 419 F. Supp. at 625. As noted above, Plaintiffs could file national grievances, ULPs, or seek clarification of their right to represent BOP employees from the FLRA, *see* 5 U.S.C. § 7111(b)(2), so meaningful relief is available.

Second, Plaintiffs' claims are within the statutory scheme and not collateral to it. To determine the centrality of claims, the Court must "examine whether the action 'at bottom' seeks a substantive determination that falls within the statutory regime's exclusive scope." *Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 563 (D.C. Cir. 2023) (quoting *Heckler v. Ringer*, 466 U.S. 602, 614 (1984)). As the Supreme Court explained, a claim may be sufficiently collateral to permit district court review when the "claims do not relate to the subject of the [administrative] actions." *Axon*, 598 U.S. at 193. There, the Supreme Court noted that "separation-of-powers claims" brought against the administrative agency were entirely unrelated to the "auditing practices" and "business merger" that constituted the subject matter of the agency actions. *See id.* at 193–94. Nor were they related to the "procedural or evidentiary matters an agency often resolves on its way to a merits

14

decision." *Id.* No such separation exists here. Plaintiffs challenge the termination of the CBA that CPL-33 and the BOP negotiated under the FSLMRS. *See, e.g.*, Complaint ¶¶ 7, 56–70. The loss of these collectively bargained rights and privileges fall within the FSLMRS's broad definition of "grievance," which the CBA and FSLMRS provide the exclusive procedures for resolving.[8] *See* 5 U.S.C. §§ 7103(a)(9), 7121(a)(1); Hemingway Decl., Ex. 1; ECF No. 28-3. Plaintiffs generally allege that by terminating the CBA, the BOP has violated FSLMRS requirements. *See* Compl., ¶¶ 4–5; 49–55. That is a quintessential ULP charge, which the FLRA General Counsel prosecutes, 5 U.S.C. §§ 7116(a)(8), 7118, and is central to the FLRA's responsibility. Plaintiffs' claim is clearly not collateral. *See AFGE I*, 929 F.3d at 760 ("The unions' challenge in this case is of the type that is regularly adjudicated through the FSLMRS's scheme: disputes over whether the Statute has been violated."); *SEIU II*, 419 F. Supp. at 625 ("Plaintiffs' substantive APA challenges to the Executive Orders and Guidances are one of the vehicles they have chosen to pursue their ultimate goal of prohibiting agencies from complying with the Executive Orders' provisions.")

Buttressing this conclusion, in *AFGE v. Loy*, the D.C. Circuit held that despite an FLRA ruling "that the [Aviation and Transportation Security Act, Pub. L. No. 107–71, 115 Stat. 597 (2001)] and [the Under Secretary of Transportation's] directive [that airport screeners could not collectively bargain] foreclosed collective bargaining for all federally-employed airport screeners

---

[8] The FSLMRS defines a "grievance" as including, *inter alia*, "any complaint[] . . . by any labor organization concerning any matter relating to the employment of any employee; or . . . by any labor organization . . . concerning . . . the effect or interpretation, or a claim of breach, of a collective bargaining agreement." 5 U.S.C. § 7103(a)(9). Also included within the definition is "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment." *Id.* Pursuant to 5 U.S.C. § 7121(a)(1), "any collective bargaining agreement shall provide procedures for the settlement of grievances, including questions of arbitrability[,]" and except for narrow circumstances provided for in the Statute, "[these] procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage."

and thus precluded representation elections," the union-plaintiffs' only pathway to assert their bargaining rights in federal court was in an appeal to a circuit court after FLRA proceedings "pursuant to § 7123." 367 F.3d 932, 936 (D.C. Cir. 2004). The FLRA has "exclusive authority to render judgment on the question" of whether the exclusion of employees from collective bargaining rights is valid. *Id.*; *see also id.* at 935 (holding that federal district courts lack "concurrent jurisdiction over matters within the [FLRA's] exclusive purview"). Additionally, Congress has also entrusted to the FLRA the ability to clarify Plaintiffs' right to represent employees at the BOP—an avenue Plaintiffs seemingly have not pursued. *See* 5 U.S.C. § 7111(b)(2).

Furthermore, Plaintiffs may not evade the exclusive administrative scheme by raising a constitutional APA claim. *See, e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012) (holding under a similar channeling statute, the Civil Service Reform Act, that whether a claim is precluded does not "turn on the constitutional nature . . . but rather on the type of the employee and the challenged employment action"). In *AFGE I*, for example, numerous federal unions asserted broad constitutional and statutory challenges to EOs issued by President Trump during his first term. The orders would have enacted substantial changes to the way federal unions operated. The D.C. Circuit reversed the district court's decision on jurisdictional grounds, holding that the comprehensive administrative-judicial review scheme set forth by the FSLMRS channeled jurisdiction away from federal district courts. *See AFGE I*, 929 F.3d 748, 761 (D.C. Cir. 2019). The D.C. Circuit emphasized that most federal labor disputes must be heard through the FLRA review scheme, with any judicial review occurring in the relevant federal court of appeals. *Id.* at 754–61; *see also, e.g.*, *NTEU v. Vought*, 149 F.4th 762, 774 (D.C. Cir. 2025) (concluding that the district court lacked jurisdiction over the unions' claims because "a specialized-review scheme

16

governs such claims"); *SEIU I*, 420 F. Supp. 3d 65 at 74 (finding nothing suggested the union could not pursue "challenges in litigation before the FLRA and ultimately the circuit court").

Thus, the FLRA has "consistently" resolved constitutional claims, including First Amendment retaliation claims. *See U.S. Dep't of Health & Hum. Servs. & Laborers Int'l Union Loc. 1376*, 60 F.L.R.A. 202, 207 & n.7 (2004) (citing cases). For example, in *United States Department of Defense Ohio National Guard & AFGE Local 3970*, the FLRA addressed several constitutional provisions including the Militia Clause to resolve a jurisdictional dispute. 71 F.L.R.A. 829, 853 n.13, 855–62 (2020) (citing and analyzing arguments regarding U.S. Const. art. I, § 8, cls. 15 & 16, art. II § 2, cl. 1, and Amend. X). This case was eventually appealed to the Supreme Court in *Ohio Adjutant General's Department v. FLRA*, 598 U.S. 449 (2023).

Finally, Plaintiffs' claims are clearly within the expertise of the FLRA. Congress has designed the FLRA as the arbiter on matters of federal labor relations. *See, e.g.*, *ATF*, 464 U.S. at 97 ("[T]he FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act.") (citation omitted). And Plaintiffs' claim of improper denial of collective bargaining rights is exactly the type of claim the FLRA regularly hears. *See* 5 U.S.C. §§ 7116(a), 7118; 7121. The same is true of any claim filed seeking to clarify Plaintiffs' ability to represent BOP employees. *Id.* § 7111(b)(2). For example, in concluding that the unions had to first bring their constitutional claims before the FLRA in *AFGE I*, the D.C. Circuit noted that those agencies, despite having less expertise on constitutional issues, may be able to "offer an interpretation of the [statutes] in the course of the proceeding that might alleviate or shed light on the constitutional concerns." *AFGE I*, 929 F.3d at 761 (citation omitted); *see also SEIU II*, 419 F. Supp. 3d 612, 626 (Noting the court was "persuaded by the D.C. Circuit's assessment of this third *Thunder Basin* factor.").

17

In sum, the *Thunder Basin* factors establish that the FSLMRS precludes district court jurisdiction over Plaintiffs' claims, which must be channeled to the FLRA because the Court lacks jurisdiction over those claims.

### b. Plaintiffs have other adequate remedies in court

Separately, but along similar lines, the APA contains a gatekeeping proviso that requires dismissal of this action. Specifically, review under the APA is available only where "there is no other adequate remedy in a court." 5 U.S.C. § 704. That requirement reflects that "Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). The alternative remedy "need not be identical" but "need only be adequate." *Panjiva, Inc. v. U.S. Customs & Border Prot.,* 342 F. Supp. 3d 481, 495 (S.D.N.Y. 2018) (quotations omitted), *aff'd,* 975 F.3d 171 (2d Cir. 2020); *see also Zaidan v. Tillerson*, No. 17cv3604, 2018 WL 3769966, at *3 (E.D.N.Y. Aug. 9, 2018). Accordingly, if there exists an alternative adequate remedy, a plaintiff lacks a cause of action under the APA. *See e.g. Morales v. U.S. Dep't of Hous. & Urb. Dev.,* No. 21cv1171 (SVN), 2022 WL 4237071, at *6 (D. Conn. Sept. 14, 2022) (APA did not permit judicial review of HUD's reasonable cause determination given other adequate remedy in court); *Panjiva*, 342 F. Supp. 3d at 495 (FOIA constituted other adequate remedy to APA action seeking disclosure of aircraft manifest information) (citations omitted); *Zaidan*, 2018 WL 3769966, at *3 (Action seeking "judicial review of the Secretary of State's denial of a passport application is foreclosed" by a statute that designates other adequate remedy) (citations omitted). Again, the FSLMRS designates an adequate remedy with the FLRA.

### 2. This Court should dismiss this action as impermissible claim splitting

18

The rule against claim-splitting means that "a plaintiff cannot avoid the effects of *res judicata* by 'splitting' his claim into various suits, based on different legal theories (with different evidence 'necessary' to each suit)." *Waldman v. Village of Kiryas Joel*, 207 F.3d 105, 110 (2d Cir. 2000) (citation omitted). The "rule against claim splitting is based on the belief that it is fairer to require a plaintiff to present in one action all of his theories of recovery relating to a transaction, and all of the evidence relating to those theories, than to permit him to prosecute overlapping or repetitive actions in different courts or at different times." *AmBase Corp. v. City Investing Co. Liquidating Tr.*, 326 F.3d 63, 73 (2d Cir. 2003) (quotations omitted). "Therefore, when a plaintiff has had a full, free and untrammelled opportunity to present his facts, but has neglected to present some of them or has failed to assert claims [that] should in fairness have been asserted, he will ordinarily be precluded by the doctrine of res judicata from subsequently pressing his omitted claim in a subsequent action." *Id.* (quotations omitted).

A key question in determining whether and action constitutes claim splitting is "'whether the two claims arise from the same 'nucleus of operative fact.'" *Connecticut v. Sandoz, Inc.*, No. 20cv00802 (MPS), 2025 WL 2491260, at *1 (D. Conn. Aug. 13, 2025) (quoting *Davis v. Norwalk Econ. Opportunity Now, Inc.*, 534 F. App'x 47, 48 (2d Cir. 2013)) (summary order). In other words:

> The essential question is whether the overlapping facts are sufficiently related to each other so as to constitute a single transaction or series of transactions. Furthermore, although *res judicata* will not bar a suit based upon legally significant acts occurring *after* the filing of a prior suit that was itself based upon earlier acts and a party is not required to amend a complaint to assert causes of action arising from events occurring after the filing of a complaint, the bar will apply when the subsequent facts are merely additional examples of the earlier-complained of conduct, such that the action remains based principally upon the shared common nucleus of operative facts.

19

*Cameron v. Church*, 253 F. Supp. 2d 611, 620 (S.D.N.Y. 2003) (internal citations and quotations omitted). "In assessing whether [] two actions arise from 'the same nucleus of operative facts' for purposes of the preclusion inquiry, courts consider (1) whether the case involves the same parties and their privies, and (2) whether separate cases arise from the same transaction or series of transactions." *Tera Grp., Inc. v. Citigroup, Inc.*, No. 17cv4302, 2019 WL 3457242, at *9 (S.D.N.Y. July 30, 2019) (quotations omitted). *"*[T]he focus of the claim splitting doctrine is as much about preserving judicial resources as it is about fairness to defendants.*" Id.* (collecting cases).

Here, Plaintiffs filed this suit before resolution of an earlier-filed suit arising out of the same transaction and occurrence referenced in the Complaint. *See* Compl. ¶ 33. Specifically, in April 2025, six major unions sued in the Northern District of California to enjoin the EO. *See AFGE II*, No. 25cv3070, ECF No. 1. AFGE is the lead plaintiff in that case. *See id.* ¶17. The DOJ (of which the BOP is a sub-agency) and the U.S. Attorney General are defendants in that case, and the "issue [of privity] is one of substance rather than the names in the caption of the case." *Alpert's Newspaper Delivery v. New York Times,* 876 F.2d 266, 270 (2d Cir. 1989). Plaintiffs are affiliates of AFGE in privity with collective bargaining representation of BOP employees. *See* Compl. ¶¶ 12–17. Indeed, in *AFGE II*, the AFGE alleges *it* represents all bargaining unit employees at the BOP. *AFGE II*, No. 25cv3070, ECF No. 1 at ¶¶ 113, 163. Any legal claims Plaintiffs have regarding the BOP's termination of its CBA with CPL-33 are shared by AFGE's interests as the representative of all bargaining unit employees at the BOP. Any decision in *AFGE II* will have a direct impact on Plaintiffs' rights and BOP's obligations to Plaintiffs.

Both *AFGE II* and the instant case arise from the same nucleus of operative facts. Specifically, the BOP's cancellation of the CBA is one of a series of connected, related transactions in the implementation of the EO. They can be summed up in two steps. First, the President signed

20

the EO after determining that DOJ is excepted from the FSLMRS; second, the BOP implemented the EO by terminating the CBA.

The prohibition against claim splitting applies even when, as here, the subsequent connected, related event occurs after the plaintiff files the first lawsuit, but "remains based principally upon the shared common nucleus of operative facts." *Cameron*, 253 F. Supp. 2d at 620 (citation omitted); *see also Mulero v. Hartford Bd. of Educ.*, No. 05cv630 (PCD), 2006 WL 752852, at *4 (D. Conn. Mar. 20, 2006). While Plaintiffs question the timing of the BOP's decision to end the CBA, they cannot deny the letter provided to CPL-33 specifically indicated the decision flowed directly from a common nucleus to *AFGE II*—the President's issuance of the EO with specific implementation instructions to the DOJ and other affected agencies. *Compare AFGE II*, 148 F.4th at 653 (describing the case as seeking a preliminary injunction "to enjoin the government from implementing EO 14,251") *with* Compl. ¶ 50 (noting the "BOP's termination letter claimed that the termination was to carry out Executive Order 14251"). And the ending of CBAs is central to the complaint in *AFGE II*. *See AFGE II*, No. 4:25cv3070, ECF No. 1, ¶¶ 120, 237.

The outcome of *AFGE II* has the potential to be either outcome determinative for the instant case or, at the very least, to significantly narrow the issues to be decided. It would be outcome determinative if the *AFGE II* plaintiffs prevail because the DOJ and BOP would be enjoined from implementing the EO. At the very least, *AFGE II* has the potential to narrow the issues in dispute, given the common legal issues in both suits. *Compare* Complaint ¶¶ 66-70 *with Am. Fed. Of Gov't Emps. v. Trump*, No. 4:25cv3070, ECF No. 1 (N.D. Cal. June 24, 2025) (Both asserting First Amendment retaliation claims to challenge the implementation of the EO.). [9]

---

[9] In AFGE's litigation challenging the EO out of the Northern District of California, the district court "granted Plaintiffs' request for a preliminary injunction, ruling only on the basis of First Amendment retaliation, which the court deemed Plaintiffs' strongest claim." *Am. Fed'n of*

21

Consequently, "[a]s part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Fisher v. SmithKline Beecham Corp.*, No. 07cv0347, 2009 WL 10681947, at *18 (W.D.N.Y. Mar. 11, 2009) (quotations omitted). Either is a reasonable course of action and Plaintiffs cannot credibly argue otherwise. AFGE itself proposed this same approach in the related *Department of Defense v. AFGE*, No. 25cv00119, ECF No. 41, p. 16 (W.D. Tex. Mar. 27, 2025) ("*DOD v. AFGE*" or "the Texas litigation"). In that case, AFGE asked the district court not to proceed with the case given the ongoing proceedings in *AFGE II*:

> There is another lawsuit pending in the Northern District of California, filed by AFGE and several other national unions affected by the Executive Order. The plaintiffs in that case have already moved for a preliminary injunction and submitted evidence in support. That case will provide *for full adjudication* of the validity *and effect* of the Executive Order—including constitutional claims under the First and Fifth Amendments that are not before this Court, *and the claims of the vast majority of AFGE affiliates, as well as other unions, who are not party to this suit.*

*DOD v. AFGE*, No. 25cv00119, ECF No. 41 at 16 (referencing *AFGE II*) (emphasis added).  In the Texas litigation, AFGE elaborated that allowing the case to proceed would waste judicial resources, contribute to "duplicative or piecemeal litigation," and pose an "obvious" risk of "confusing and/or conflicting judgements." *Id.* at 19–20. The same rationale applies here with greater force given that, in the nearly one year since the AFGE first made that argument, *AFGE II* has progressed even further. As noted above, in July 2025, prior to Plaintiffs' filing suit in this Court, the Ninth Circuit stayed a preliminary injunction in *AFGE II* pending an appeal. That

---

*Gov't Emps., AFL-CIO v. Trump,* 148 F.4th 648, 653 (9th Cir. 2025) (citation omitted). However, the Ninth Circuit found the Government established the factors which would warrant a stay, including likelihood of success on the merits of a retaliation claim. *Id.* By not raising the retaliation claim in the PI motion here, Plaintiffs further demonstrate their intention to claim split, testing various legal theories arising out of the same nucleus of operative facts in different courts.

preliminary injunction sought, as Plaintiffs seek here, to prevent the DOJ and the BOP from implementing the EO. *AFGE II*, 148 F.4th at 648. The Ninth Circuit heard oral argument on the appeal of the preliminary injunction on January 12, 2026, and the matter remains pending before that circuit court.

In sum, after failing to secure the relief sought in their original chosen forum, Plaintiffs now attempt to hedge their claim under an alternate APA theory in this district. For this reason, and the reasons the AFGE articulated in the Texas litigation, this case should not proceed here and instead should be dismissed.

**3. The Complaint alternatively should be dismissed for failure to state a claim**

**a. Count One – BOP's actions are not arbitrary and capricious**

**i. BOP's cancellation of the CBA was rational**

"Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Magellan Tech., Inc. v. FDA*, 70 F.4th 622, 628 (2d Cir. 2023), *cert. denied*, 145 S. Ct. 1920 (2025)). The explanation need not be "perfectly clear, provided the agency's path to its conclusion may reasonably be discerned." *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007). "Under the arbitrary-and-capricious standard, judicial review of agency action is necessarily narrow. A reviewing court may not itself weigh the evidence

or substitute its judgment for that of the agency." *Magellan Tech, Inc.*, 70 F.4th at 628–29 (internal quotation marks omitted). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness." *Prometheus Radio*, 592 U.S. at 423.

Even accepting the Complaint's factual allegations as true, Director Marshall clearly "acted within a zone of reasonableness" when terminating the CBA. *Id.* None of Plaintiffs' allegations and arguments to the contrary withstand scrutiny.[10]

First, Plaintiffs argue the BOP's termination letter did not consider all important aspects of the issue or articulate a satisfactory explanation for its action, alleging it was "conclusory," did not address Plaintiffs' perception that the EO did not direct the BOP to terminate the CBA, or explain why there was a delay between the issuance of the EO (and the Ninth Circuit's stay of a preliminary injunction concerning the EO) and the termination of the CBA. *See* Compl. ¶ 60; PI Memo at 19. In their argument, Plaintiffs largely rely on principles outlined by the Second Circuit in a decision which dealt with a review of the United States Citizenship and Immigration Services' ("USCIS") decision to deny an Afghan national lawful permanent residence under the elements of the "weapons bar" outlined in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1182(a)(3)(B)(iii). *See* PI Memo at 14–17 (citing *Kakar v. USCIS*, 29 F.4th 129, 132, 135 (2d Cir. 2022)). But *Kakar* dealt with the review of USCIS action based on Congressional direction to USCIS in the INA with clear law to apply in review; the INA outlined classes of aliens who are ineligible for visas or admission, with each having elements, definitions, and exceptions for agencies to apply. *See* 8 U.S.C. § 1182.

---

[10] Plaintiffs note the BOP's termination "was arbitrary and capricious for at least six different reasons," *see* ECF No. 29-1, p. 22, though the reasons appear to overlap and are not clearly delineated.

Here, the EO sets forth determinations made by the President in accordance with a statute and does not outline "relevant factors" for consideration by the DOJ or the BOP. *See* EO 14,251; *see also*, *e.g., Nat. Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 97 (2d Cir. 2001) (APA review is "narrow" and limited to examining whether an agency's decision "was based on a consideration of the relevant factors."). Nor would one expect such considerations as the President had already made the determination and left the DOJ and BOP merely to implement his decision.[11] Given the President's determinations, both authorized by statute and his inherent power to manage government employee relations, that the DOJ should not be subject to the requirements of the FSLMRS—which is not at challenged here—the cancellation of the CBA because of the EO cannot be arbitrary and capricious or not reasonably explained. In fact, the EO made all the necessary considerations and determinations and left no decision-making flexibility to the BOP.

This is significant because "an agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017).[12] This is not an instance where the BOP accomplished a

---

[11] The EO's implementation section stated, in relevant part, that "[w]ith respect to employees in agencies or subdivisions thereof that were previously part of a bargaining unit but have been excepted under this order, each applicable *agency head shall, upon termination of the applicable collective bargaining agreement . . .*" Exec. Order 14,251, § 6. The EO also stated it "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." *Id.*, § 8.

.

[12] The language at Section 8 of the EO "serves the purpose of foreclosing" the argument that "the zone of interests that the Executive Orders sought to protect . . . are not meant to expand the rights or entitlements of any individual federal employee (or union)." *SEIU II*, 419 F. Supp. 3d at 621 (noting the President's directive expressly stated it "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.").

25

presidential directive via the BOP's own statutory authority or discretion. Here, Plaintiffs attempt to attack the BOP's implementation of lawful presidential action pursuant to the President's own congressionally-delegated discretionary authority. "Due to the separation of powers at stake here and the absence of an express statement by Congress concerning the availability of judicial review," the Court should be "hesit[ant] to subject" this case "to the APA." *Id.* at 104.

Next, Plaintiffs allege the BOP did not offer a "satisfactory explanation" and relied on factors Congress did not intend it to consider. *See* Compl. ¶¶ 60-62 PI Memo at 19, 21. Plaintiffs further argue, inaccurately, that the Government's own litigation position has been that the EO does not mandate the termination of CBAs but leaves that decision to each agency's discretion, and the BOP did not explain why it terminated the CBA effective immediately versus on some later date. *See* Compl. ¶ 60; PI Memo at 20. Yet, the Director's termination letter—as Plaintiffs acknowledge—states the termination of the CBA was "based on the EO." Compl. ¶ 51; PI Memo at 19 (citing Ex. 2). But Plaintiffs' apparent dissatisfaction with the timing of the cancellation of the CBA does not mean that the Director's decision was based on impermissible reasons. The Director stated he was acting consistent with the President's decision to exempt the DOJ from the FLMRS pursuant to his "broad authority under 5 U.S.C. § 7103(b)(1)." In other words, the Director explained he was implementing the President's *discretionary decision committed to the President by Congress*, not some authority *committed to the BOP* by Congress. *Detroit Int'l Bridge Co.*, 189

---

Additionally, "executive orders are not privately enforceable unless they were 'intended by the executive to create a private right of action.'" *Feldman v. Reno*, No. 99cv2663, 2000 WL 4158, at *4 (S.D.N.Y. Jan. 3, 2000) (quoting *Zhang v. Slattery,* 55 F.3d 732, 748 (2d Cir.1995).

F. Supp. 3d at 104 (D.D.C. 2016) ("Courts lack jurisdiction to review an APA challenge in the former circumstances, regardless of whether the President or the agency takes the final action.").

### ii.    The APA bars judicial review of discretionary action

The Court alternatively should dismiss Plaintiffs' arbitrary and capricious claim because the APA bars judicial review when the challenged action "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). If, as Plaintiffs argue, "[t]he federal government has explicitly stated that agencies 'may choose' to terminate CBAs in light of the EO, as a matter of agency discretion, meaning the EO does not mandate such action," PI Motion at 5–6, then review is still precluded. *See also* Compl. ¶ 27.

Agency action may be deemed committed to agency discretion "even where Congress has not affirmatively precluded review." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Where "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"—where, effectively, "there is no law to apply"—the APA does not permit judicial review. *Id.* When considering whether a matter is committed to agency discretion, courts review the statutory scheme to determine if it provides an adequate standard of review. *Id.* at 831. "Congress may limit an agency's exercise of enforcement power if it wishes," but only when Congress "has indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion, there is 'law to apply' under § 701(a)(2)." *Id.* at 833-34. Courts may also consider whether, as a matter of tradition, action is committed to agency discretion. *See id.* at 832 ("[S]uch a decision has traditionally been 'committed to agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition.").

27

First, as noted above, the FSLMRS grants the discretion to the President, not the BOP, and the President's discretionary decisions are not reviewable in APA actions. *See supra* at Section II.A. As such, the Court's review should end there.

But, even as to the BOP's actions, there are no "judicially manageable standards" for the Court to apply to evaluate the propriety of the BOP's ending the CBA pursuant to a statutorily authorized Presidential determination. *See, e.g., Salazar v. King,* 822 F.3d 61, 76 (2d Cir. 2016) ("We must therefore consider whether the statutes and regulations at issue in this case are drawn in such broad terms that . . . there is no law to apply.") (quotations omitted).[13] There is simply no law to apply for a court to determine how long after the issuance of the EO would be too short or too long to cancel the CBA, or to what extent an agency needs to expound upon a President's exercise of discretionary authority as Plaintiff's ask of this Court. Indeed, 5 U.S.C. § 7103(b)(1) does not "expressly call *upon the President* to insert written findings into an exempting order." *AFGE v. Reagan.,* 870 F.2d at 727 (emphasis added). In short, while the BOP action in this case implemented the President's discretionary decision committed to him by statute, to the extent Plaintiffs argue the EO afforded the BOP with independent discretion to cancel the CBA, there is no law to apply, and judicial review of such discretionary action is still barred by the APA.

### iii.    The Director's termination letter was not pretextual

Finally, Plaintiffs argue the termination letter was "plainly 'contrived' and pretextual" and therefore arbitrary and capricious. *See* Compl*.,* ¶ 63-65; PI Memo at 20, ECF No. 29-1. Plaintiffs point to a perceived inconsistency between the termination letter and the Director's public message

---

[13] For substantially similar reasons, Plaintiffs' arguments that the BOP "completely failed to consider the 'serious reliance interests' of BOP employees who depended on the protections and procedures of the CBA," PI Memo at 21, ECF No. 29-1, and that the BOP's "termination failed to consider alternatives," PI Memo at 22, ECF No. 29-1, are without merit.

28

to employees. *See id.* Even if the Director's message outlined perceived tangential benefits to BOP employees that flowed from the cancellation of the CBA, the letter to CPL-33 clearly noted the sole reason for the cancellation was the EO. The letter announced the termination of the CBA and what that meant for the BOP going forward. But again, the EO made all the necessary considerations and determinations and left no decision-making flexibility to the BOP; the decision to terminate the CBA flowed entirely from the EO. Regardless, it is a "settled proposition[]" that even if an agency has additional reasons, subjective desires, or political considerations, it is not cause for a court to invalidate the result. *See Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) ("Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relations, interest group relations, foreign relations, and national security concerns (among others)."). Even where "an agency gives multiple reasons" a court "may uphold its decision based on any one of those reasons." *Texas Tech Physicians Assocs. v. U.S. Dep't of Health & Hum. Servs.*, 917 F.3d 837, 844 n.4 (5th Cir. 2019) (citing *Salt River Project Agr. Imp. & Power Dist. v. United States*, 762 F.2d 1053, 1060 n.8 (D.C. Cir. 1985)).

In sum, Count One must be dismissed for failure to state a claim.

### b. Count Two – BOP's actions are not First Amendment retaliation

#### i.    The decision to cancel the CBA was not retaliatory

Plaintiffs' First Amendment claim likewise fails. "[I]n order to survive a motion to dismiss a complaint, a plaintiff asserting First Amendment retaliation claims must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003). "In order to satisfy the causation requirement, allegations must be sufficient to support the inference that the speech *played a*

29

*substantial part* in the adverse action." *Id.* at 354 (quotations omitted) (emphasis added).

At bottom, Plaintiffs' suit is a challenge to the BOP's implementation of the EO. *See* Compl. ¶¶ 24-28, 49-51. Courts have repeatedly rejected First Amendment challenges to Presidents' executive orders issued under 5 U.S.C. § 7103(b)(1). *See, e.g.*, *NTEU v. Reagan*, No. 80-606, 1981 WL 150530, at *3 (D.D.C. Sept. 3, 1981) (rejecting such a challenge and noting an identical holding in *Police Ass'n of the District of Columbia v. Dep't of Treasury*, No. 78-0236 (D.D.C. May 19, 1980)). Most recently, in *AFGE II*, the Ninth Circuit concluded that "the government has shown that it is likely to succeed on the merits of the [First Amendment] retaliation claim" challenging the Executive Order. *AFGE II*, 148 F.4th at 654.

Plaintiffs' allegations are simply insufficient to support the inference that their advocacy before Congress against legislation supported by the Administration, played a substantial part in the CBA termination. *See* Compl., ¶ 68. Nor could Plaintiffs credibly make such an allegation because, as demonstrated in Section IV.A.3.a., *supra*, the Director terminated the CBA in response to the President's EO and the EO made all the necessary considerations and determinations and left no decision-making flexibility to the BOP.

### ii.    Any viewpoint discrimination claim also fails.

To the extent that Plaintiffs raise a First Amendment viewpoint discrimination claim, *see* Compl. ¶ 67 ("The First Amendment also prohibits" the government suppressing speech based on disagreement with the speaker's viewpoint."), that claim is merely a repackaged version of their retaliation claim and should be dismissed as duplicative. "[D]etermining whether government action violates the First Amendment requires [the] application of different doctrines that vary depending on the circumstances." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 201 (2024) (Jackson, J. concurring). The allegations in Plaintiffs' Complaint are best addressed within the retaliation framework discussed above, and this Court should refuse to entertain a separate,

30

duplicative viewpoint discrimination claim.

Even so, the Complaint "does not identify any instances in which Plaintiff[s were] prevented from expressing a particular viewpoint. . ." *Odermatt v. Way*, 188 F. Supp. 3d 198, 213 (E.D.N.Y. 2016), *aff'd sub nom.*, 694 F. App'x 842 (2d Cir. 2017). Plaintiffs also fail to identify *any viewpoint* that either the EO or the BOP's termination prohibits or targets.

Moreover, Plaintiffs lack a First Amendment right to collective bargaining. "[T]he First Amendment does not impose any affirmative obligation on the government . . . to recognize [a public employee union] and bargain with it." *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979); *see also Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 313 (1979) (Arizona's recalcitrance to negotiate with union posed "no First Amendment problems"); *Goldstein v. Pro. Staff Cong./CUNY*, 96 F.4th 345, 350 (2d Cir. 2024) ("First Amendment does not guarantee public employees the right to engage in collective bargaining with their employer."). Indeed, "[t]here is . . . no constitutionally protected right to bargain collectively." *Fraternal Order of Police v. Bd. of Governors of the Fed. Reserve Sys.*, 391 F. Supp. 2d 1, 8–9 (D.D.C. 2005) (citations omitted). The BOP's termination of the CBA does not otherwise impinge on any protected activity—it does not bar Plaintiffs from recruiting employees to join their unions, petitioning the Government, or engaging in any other protected First Amendment activity.

The EO and the BOP's termination are facially neutral and silent as to any speech or viewpoint. Neither the BOP's termination nor the EO itself distinguish between unions, let alone drew lines based on unions' viewpoints. Instead, the EO distinguishes *agencies or subdivisions*, and the BOP implemented the viewpoint-neutral EO by cancelling the CBA with "the exclusive representative of BOP employees." Compl., ¶ 13. Plaintiffs vaguely allege their "advoca[cy]" and "associational activities" were the reason for the CBA termination. *Id.,* ¶ 68. But the effect of union

31

collective bargaining activity on a federal agency or subdivision's national security functions is obviously a valid consideration within the scope of § 7103(b)(1).

In sum, Plaintiffs fail to state a claim under any First Amendment theory pursuant to § 706(2)(B).

## B.  The Court should stay the case or transfer venue

While the Court should dismiss the case, if it does not, the Court should stay the case for claim splitting pending a final outcome in *AFGE II* out of the N.D. Cal., as outlined above.  *See supra* at Section IV.A.2.

Additionally, the Court should stay the matter for prudential reasons.  "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. N. Am. Co.,* 299 U.S. 248, 254–55 (1936) (citation omitted). "In determining the appropriateness of the stay, three factors are to be considered: (1) whether a stay will simplify the issues in question and trial of the case; (2) the stage of the proceedings; and (3) whether a stay will prejudice the nonmoving party." *Conair Corp. v. Tre Milano, LLC*, No. 14cv1554 (AWT), 2015 WL 4041724, at *2 (D. Conn. July 1, 2015) (quotations omitted).

As outlined above, this is a viable option for the Court, as (1) *AFGE II* is further along in litigation, as it is pending a decision before the Ninth Circuit; (2) that case has significant factual and legal overlap with this matter, and (3) there is no undue prejudice to Plaintiffs, because they are expecting a dispositive ruling from the Ninth Circuit imminently. And even if Plaintiffs here experience some delay while awaiting the Ninth Circuit's decisions, the public interest in staying

cases such as this to settle or simplify issues outweigh moderate delays that a non-moving party may experience from a stay. *See Landis*, 299 U.S. at 256; *see also supra* at Section IV.A.2.[14]

### C. The motion for a preliminary injunction should be denied

Even if the Court were to find subject matter jurisdiction and not dismiss, stay, or transfer this action, Plaintiffs are unable to "make a clear showing" on *any* of the four preliminary injunction factors, let alone each of them. *See Starbucks Corp. v. McKinney,* 602 U.S. 339, 345 (2024). Particularly given the "substantial overlap between" the factors appellate courts use to assess a stay "and the factors governing preliminary injunctions," *Nken*, 556 U.S. at 434, it is instructive that both the D.C. Circuit and the Ninth Circuit assessed each prong of the stay factors in the Government's favor in three cases challenging the implementation of the EO. *See AFGE II*, 148 F.4th at 654–56; *NTEU*, 2025 WL 1441563, at *1–3; *AFSA II*, 2025 WL 1742853, at *1.[15] The reasoning of the appellate courts in those related cases should inform this Court's disposition of the pending motion. *See Trump v. Boyle*, 606 U.S. ---, 145 S. Ct. 2653, 2654 (2025) (although "interim orders are not conclusive as to the merits, they inform how a court should exercise its equitable discretion in like cases").

#### 1. Plaintiffs are unlikely to succeed on the merits of their APA claim

##### a. APA review is unavailable due to potential alternative remedies

---

[14] Alternatively, the Court could also transfer this matter to the District Court for the District of Columbia for the convenience of parties and witnesses, and in the interest of justice. Defendants are simultaneously moving to transfer venue which has been filed under separate cover.

[15] Although the D.C. Circuit did not stay the preliminary injunction in *Federal Education Association v. Trump*, the only portion of that decision that commanded a majority concerned the Government's failure to demonstrate irreparable harm absent a stay, a burden the Government does not bear when opposing a preliminary injunction motion. No. 25-5303, 2025 WL 2738626 at *1–2 (D.C. Cir. Sept. 25, 2025).

As explained above in Section IV.A.1, Plaintiffs have an alternative adequate remedy through the FLRA.

### b. The Director did not act arbitrarily or capriciously

For purposes of the PI motion, Plaintiffs do not argue they are likely to succeed on the merits of the First Amendment APA claim in Count Two. *See generally* PI Motion. Thus, only their first claim, that BOP acted arbitrarily and capriciously in canceling the CBA, is at issue in evaluating Plaintiffs' PI Motion. For the same reasons set forth above in Sections IV.A.1, IV.A.2, and IV.A.3.a, Plaintiffs are unlikely to succeed on their claim that BOP violated the APA.

### 2. Plaintiffs cannot show irreparable harm absent a preliminary injunction

A motion for a preliminary injunction motion can, and should, be denied if the plaintiff has failed to demonstrate irreparable harm.

> To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm. Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.... Accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (internal quotations omitted).

At the outset, the timing of Plaintiffs' own litigation conduct undercuts their purported need for a preliminary injunction. Plaintiffs waited nearly two months after the BOP ended the CBA to file suit. *See* Compl., ¶ 3. Then, Plaintiffs waited an additional month to seek a preliminary injunction. *See* ECF No. 28. Surely, if they faced a harm that was truly "imminent" and "irreparable," Plaintiffs would have acted more quickly. *See, e.g., Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) ("Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking

34

enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action.").

Plaintiffs' alleged harms in any event are not "irreparable." Their alleged harms fall into two categories: (1) the loss of certain collective-bargaining benefits and privileges (such as the BOP making decisions that affect employees without union input or representation; not allowing union officials to use the BOP's facilities to conduct union business; and not providing union officials with paid time during the workday to perform union business); and (2) an alleged "diminution in union support" which Plaintiffs argue they may not be able to recover from "[a]t some point." *See* PI Memo at 23–25.

As to the first category, any loss of collective-bargaining benefits and privileges could be remedied upon a favorable ruling later with the FLRA (or a federal court) given its broad authority to issue remedial relief. *See* 5 U.S.C. §§ 7105(f)–(g), 7118. If Plaintiffs prevail, they can seek relief from the BOP for any violations of their rights conferred by the FSLMRS or the parties' CBA, including those pertaining to policy implementations or disciplinary proceedings. *See AFSA II*, 2025 WL 1742853 at *3 ("To the extent the [Union] or its members will suffer irreparable harm directly traceable to the Executive Order, as opposed to separate agency actions, the balance of [the] equities favors the Government. The competing interests—union representation versus national security—were already weighed by Congress when it passed the [FSLMRS].") And "any terminated agreements can be reinstated if Plaintiffs ultimately prevail." *AFGE II*, 148 F.4th at 656.

An alleged loss of collective bargaining rights alone does not constitute irreparable harm. While Congress in the FSLMRS may have recognized that collective bargaining provides benefits in the federal workforce, "it does not follow that" absent a preliminary injunction the "public's

35

interest in industrial peace is likely to be irreparably harmed during the time it takes to [adjudicate this case]." *Henderson for NLRB v. Bluefield Hosp. Co.,* 902 F.3d 432, 441 (4th Cir. 2018). And it is not enough, as Plaintiffs argue, that this alleged harm impairs the "entire purpose behind a union['s] existence." *See* PI Memo at 23. (quoting *Donohue v. Mangano*, 886 F. Supp. 2d 126, 152 (E.D.N.Y. 2012)).[16] Here, the constitutionality of the FLMRS and the lawfulness of the EO are not at issue. As noted above, the FLRA (or a court) can remedy any dispute that the CBA was violated or terminated unlawfully. It cannot be that any harm to a union's purpose is irreparable merely because Congress deemed such rights valuable in the FLMRS or because those rights go to the primary mission of unions. Such a holding would negate the irreparable harm requirement in all cases involving unions representing federal employees exempted under Section 7103(b)(1) and collapse the *Winter* test into a determination of whether a plaintiff is likely to succeed on the merits. This is an insufficient basis to grant the extraordinary relief of a preliminary injunction.

The second type of harm alleged by Plaintiffs is purely speculative, *i.e.*, that union support will diminish without immediate relief. *See AFGE II*, 148 F.4th at 656 (finding it "speculative whether Plaintiffs will experience harm through 'weakened support for unions.'") (citation omitted). It is unclear if union support had already waned prior to ending the CBA. It is uncertain that employees will imminently give up membership or refuse to rejoin upon a favorable ruling in

---

[16] *Donahue* does not undercut Defendants' position. There, a New York local legislature passed an act overriding its own CBAs with county employee unions during a fiscal crisis and the unions filed a Section 1983 claim for violations of the Contracts Clause of the Constitution along with other state law claims. *Donohue*, 886 F. Supp. 2d at 133 (E.D.N.Y. 2012). The court there looked through the lens of a dispute between two contracting parties (the county and union) where the local "law arguably places a knife to the throat of the unions to coerce them into making certain concessions, under the threat of the County Executive taking more egregious actions." *Id.* at 153. The decision also described the harm as ULP-type harms the FLRA could address in federal collective bargaining disputes. *Id.* (collecting cases and noting future negotiating "would be a façade" due to management's ability to unilaterally change CBA terms).

36

this case restoring the CBA or that Plaintiffs support will "only wane as time passes." PI Memo at 25. And "[t]he requirement that a party seeking a preliminary injunction demonstrate that it will suffer irreparable harm in the absence of preliminary relief necessitates more than a mere showing that the party seeking relief will see its relative position deteriorate." *Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d 244, 248 (2d Cir. 1972).

In sum, Plaintiffs fail to establish irreparable harm absent preliminary injunctive relief.

### 3. The balance of the equities and the public interest favor the BOP

A preliminary injunction is not appropriate because the balance of the equities and the public interest weigh in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding the third and fourth "factors merge when the Government is the opposing party."). A preliminary injunction would inflict harm on the public, the President, and the BOP by interfering with the national-security determinations regarding the DOJ entrusted to the President by Congress. *See* Hemingway Decl. ¶¶ 16–24; *AFSA II*, 2025 WL 1742853, at *3. As the D.C. Circuit recognized, the clear congressional purpose of § 7103(b)(1) is to allow the President to guarantee the effective operation of agencies relevant to national security without the constraints of collective bargaining. *See NTEU*, 2025 WL 1441563, at *3 (holding that "preserving the President's autonomy under a statute that expressly recognizes his national security expertise is within the public interest" because holding otherwise "would give to the courts what the Constitution gave to Congress and the President").

A preliminary injunction would displace and frustrate the President's decision, as implemented by the BOP, about how best to address issues of national security, matters on which the courts typically defer to the President's judgment. *See Trump v. Hawaii,* 585 U.S. 667, 703-05 (2018); *AFSA II*, 2025 WL 1742853, at *3 ("[O]ur review must be exceedingly deferential. When

37

a statutory delegation invokes the President's discretion in exercising core Article II responsibilities, there is little for [the] court to review."). The President has long been charged with directing the Executive Branch workforce, and he has determined that the DOJ has a primary national security function that is hamstrung by restrictive terms of union agreements that frustrate his ability to safeguard the interests of the American people. *See* Exec. Order 14,251 § 1; Hemingway Decl., ¶17. The President determined that the FSLMRS is inconsistent with national security requirements and considerations for certain agencies including the DOJ, and his determination in this zone is entitled to deference.

Additionally, the BOP has taken extensive actions to implement the EO. *See* Hemingway Decl., ¶ 21. If forced to comply with Plaintiffs' requested preliminary injunction by reinstating the CBA, the BOP would have to undo those actions by reconfiguring its dues collection system to resume the collection of union dues; returning hundreds of employee union representatives to their previous taxpayer funded union official time allocations (with many employees spending up to 100 percent of their duty hours on taxpayer funded union official time); reengaging in collective bargaining with CPL-33; reissuing thousands of square feet of government office space and a significant amount of information-technology equipment to union representatives (much of which has already been repurposed for mission-related work); and otherwise reverting back to the same practices that are inconsistent with the BOP's primary national-security work. *Id.* ¶¶ 21–22. These actions would require significant resources to accomplish, including many work hours on the part of the human resources and legal staff, payroll providers, and supervisory personnel, as well as arbitration-related expenses. *Id.* ¶ 22. These are resources that otherwise could be devoted to the implementation of Administration priorities related to ensuring that federal offenders (including those international terrorists and foreign threats investigated and convicted by other DOJ

38

components) serve their sentences of imprisonment in facilities that are appropriately secure, humane, and cost-efficient—efforts which serve to strengthen the BOP's ability to meet its critical national security mission. *Id.* ¶¶ 16.b.; 22.

For these reasons, the balance of the equities and the public interest weigh in Defendants' favor, and the Court should deny Plaintiffs' requested preliminary injunction.

### D. Any injunction should be accompanied by a bond

Under Rule 65(c), the Court may issue a preliminary injunction "*only if* the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c) (emphasis added). Plaintiffs, who are part of a large labor organization with approximately 30,000 members and affiliated with the even larger AFGE, are well-positioned to give security. *See* ECF No. 28-2, ¶4. The Court should enforce the rule here and require Plaintiffs to post security.

Because the "costs of government are borne ultimately by taxpayers," Rule 65(c) applies no less when a government agency is subject to a preliminary injunction. *Habitat Educ. Ctr. v. U.S. Forest Serv.,* 607 F.3d 453, 459 (7th Cir. 2010). And while some circuits *require* an injunction bond, "the rule in this circuit is that 'the district court may dispense with security where there has been *no proof* of likelihood of harm to the party enjoined.'" *City of Hartford v. Hills*, 408 F. Supp. 879, 887 (D. Conn. 1975) (quoting *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974) (emphasis added); *Cf. NTEU*, 2025 WL 1441563, at *3, n.4 ("[I]njunction bonds are generally required.").

Here, the possible loss to the BOP is in the millions of dollars. *See* Hemingway Decl. ¶22. The BOP estimates $8,750,000 would be the minimum amount needed to cover the BOP's costs and damages for one year should it be found that Defendants were wrongfully enjoined. *See id.;*

39

Fed. R. Civ. P. 65(c). This amount is supported by the Declaration of Jonathan Hemingway, which explains the estimated costs of restoring the bargaining relationship between the BOP and Plaintiffs. *See* Hemingway Decl. ¶ 22 (itemizing cost to return employees to taxpayer funded union time allocations, to cease the BOP's streamlined policy development process, etc.); *see also id.* ¶ 23. This declaration demonstrates a likelihood of harm to Defendants, and a bond should be entered in the amount of $8,750,000.[17]

## V.   CONCLUSION

For the foregoing reasons, the instant case should be dismissed because the Court lacks subject matter jurisdiction. If the Court finds it has subject matter jurisdiction, it should be transferred to the D.D.C., as argued in a motion filed under separate cover. Even if the Court finds jurisdiction and venue to be appropriate in this Court, it should stay the matter pending decision of the Ninth Circuit in *AFGE II*. Finally, Plaintiff's motion for a preliminary injunction should be denied. If the Court is inclined to grant any injunctive relief, Defendants request that any injunctive relief be secured by a bond.

> DAVID X. SULLIVAN
> UNITED STATES ATTORNY
>
> /s/_____
> J. Brian Meskill (ct29611)
> Assistant United States Attorney
> 450 Main Street, Rm. 328
> Hartford, CT 06103
> T: (203) 821-3700
> F: (203) 773-5373
> Brian.Meskill@usdoj.gov

---

[17] To the extent plaintiffs might contest the issuance of a bond, the Court should consider this in its irreparable harm analysis. *See NIH v. Am. Ass'n of Public Health*, 606 U.S. ---, 145 S. Ct. 2658, 2659 (2025) ("While the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'") (quoting *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304, (2010) (Scalia, J., *in chambers*).