

# Updated Answers to Frequently Asked E.O. 14251 and E.O. 14343 Questions

U.S. Office of Personnel Management sent this bulletin at 09/10/2025 02:09 PM EDT

Share / View as a webpage



# Frequently Asked Questions: Executive Order 14251 "Exclusions from Federal Labor-Management Relations Programs" (Exclusions) and Executive Order 14343 "Further Exclusions from Labor-Management Relations Program" (Further Exclusions)

Dear Chief Human Capital Officers & Deputy Chief Human Capital Officers,

On April 22, 2025, OPM released guidance in the form of frequently asked questions regarding Executive Order 14251, "Exclusions from Federal Labor-Management Programs." Since then, President Trump has successfully defended the Executive Order in federal court and, more recently, signed Executive Order 14343 titled, "Further Exclusions from Labor Management Relations Program."  As a result of these developments, OPM is updating its April 22, 2025 frequently asked questions.  Per your convenience, the 15 updated questions are marked with an asterisk (*).

For additional information and support, agency headquarters-level human resources offices may email awr@opm.gov.  Component-level human resources offices must contact their agency headquarters for assistance.  Employees must contact their agency human resources offices for further information.

U.S. Office of Personnel Management

Do not reply to this unmonitored govDelivery send-only email address.

Stay Connected with U.S. Office of Personnel Management:

  

## Subscribe to updates from U.S. Office of Personnel Management

Email Address [               ] e.g. name@example.com
Subscribe

## Share Bulletin



Powered by

Privacy Policy | Cookie Statement | Help

**Frequently Asked Questions:**

**Executive Order 14251 "Exclusions from Federal Labor-Management Relations Programs" (*Exclusions*)**
**and**
**Executive Order 14343 "Further Exclusions from Labor-Management Relations Program" (*Further Exclusions*)**

**Updated 09/10/2025. Updates to any FAQs are marked with an asterisk (*).**

**References to**

**\*Q1:** What do agencies need to do to terminate applicable CBAs?

**\*A1:** Due to ongoing litigation, agencies should not terminate, abrogate, or repudiate any CBAs with bargaining units represented by the National Treasury Employees Union (NTEU) and impacted by *Exclusions* only[1], until the conclusion of litigation or further guidance. Agencies may choose to terminate, abrogate, or repudiate CBAs with other unions, and should consult with their General Counsels to assess next steps regarding those CBAs.

**\*Q2:** Should agencies decertify bargaining units or file unit clarification petitions of covered agencies or subdivisions?

**\*A2:** Agencies should consult their General Counsels and White House Counsel before taking steps to file a decertification or unit clarification petitions in compliance with *Exclusions* and *Further Exclusions*.

**Q3:** Should agencies amend current filings for exceptions to arbitration awards where an arbitrator ordered relief for a bargaining unit covered under *Exclusions* or *Further Exclusions*?

**A3:** Agencies should amend current filings and take the position that the union lacks standing as it is not recognized as a result of *Exclusions* and *Further Exclusions* and thus the award is invalid.

**Q4:** In any ongoing proceedings in which an agency is asked to submit a statement of position regarding an unfair labor practice charge under investigation by the FLRA, should agencies submit a statement?

**A4:** Yes. The statement should mention, and agencies should identify for the appropriate FLRA regional office, the Administration's position that the relevant agency or agency subdivision is no longer subject to provisions of the Federal Service Labor-Management Relations Statute (FSLMRS) per the *Exclusions* and *Further Exclusions* order. Under that position, the union no longer has standing to file a charge or ask the FLRA to issue a complaint.

**Q5:** Should agencies and agency subdivisions covered by *Exclusions* and *Further Exclusions* continue to participate in mediation and alternative dispute resolution (ADR) efforts with labor unions representing police officers, security guards, and firefighters? What about bargaining

---

[1] As noted elsewhere in these FAQs, agencies should treat bargaining units represented by NTEU and impacted only by *Further Exclusions* the same as any non-NTEU bargaining units unless otherwise directed in this document.

units comprised of other occupations?

**A5:** Agencies may continue collective bargaining activities, including dispute mediation and ADR efforts and other third-party proceedings with unions representing police officers, security guards, and firefighters, provided that these unions continue to be recognized consistent with *Exclusions* and *Further Exclusions*. However, for matters involving a dispute for any unit that represents positions now excluded under Executive Order 12171, as amended, agencies should continue those dispute resolution activities only if they are doing so independently of any requirements of a CBA and not relying on any provisions of Chapter 71 to compel their participation.

**\*Q6:** Should agencies change the bargaining unit status codes on employees' SF-50s?

**\*A6:** For bargaining unit employees represented by NTEU and impacted by *Exclusions* only, no. Agencies should wait until litigation over *Exclusions* is resolved before doing so. For all other unions, agencies should change their bargaining unit status code to '8888'.

**Q7:** What is meant by the term "subdivision?"

**A7:** The term "subdivision" refers to any organization, office, or component that is subordinate to an agency or department head, as well as any division within those organizations, offices, or components.

**\*Q8:** What is meant by Section 2 of *Exclusions* where it states: "the immediate, local employing offices of any agency police officers, security guards, or firefighters…"

**\*A8:** This means an agency or subdivision that directly supervises and employs such employees at the local level. This category will generally include purely the law enforcement officers, security guards, or firefighters in question. Please contact OPM if you have any questions as to whether specific employees are covered by the exclusion.

**Q9**: What actions should agencies take regarding bargaining units that represent both (i) employees in positions *not* subject to exclusion (e.g., police officers, security guards, firefighters) and (ii) agency employees now *excluded* under the President's new directive?

**A9:** Agencies should preserve the rights of employees not excluded from collective bargaining including by continuing to participate in third-party procedures (e.g., arbitrations) that are focused solely on conditions of employment, contractual and statutory obligations, or other matters limited to these employees. For employees no longer included in a bargaining unit, agencies should follow the direction provided in this guidance. If agencies need further guidance, please contact OPM at awr@opm.gov.

**Q10:** If an employee is no longer permitted to join or form a labor organization under the FSLMRS, may he or she strike against the Government while serving as a federal employee?

**A10:** Under 5 U.S.C. § 7311, employee strikes against the Government of the United States are prohibited for all Federal employees, irrespective of whether they are in a bargaining unit.

**Q11:** Can grievances initially filed under a negotiated grievance process (5 U.S.C. 7121) be transitioned to an administrative grievance process?

**A11:** Yes. Agencies may transfer a grievance initially filed under a negotiated grievance procedure to its internal administrative grievance procedure provided the matter is not excluded by the agency's administrative grievance procedure and the grievant timely requests to transition to the administrative grievance procedure.

**Q12:** Are unions ineligible as employee representatives under the FSLMRS permitted to establish consultative relationships with agencies pursuant to 5 C.F.R. Part 251?

**A12:** OPM's regulations "[provide] a framework for consulting and communicating with **non-labor organizations** representing Federal employees and with other organizations on matters related to agency operations and personnel management." *See* 5 C.F.R. Part 251 (emphasis added). A union is a "labor organization," as defined in 5 U.S.C. 7103(a)(4), and is therefore, not covered by 5 C.F.R. Part 251 whether they represent bargaining unit employees at an agency or not.

**Q13:** With announcement of *Exclusions* and *Further Exclusions*, are covered agencies still required to submit data to OPM regarding taxpayer-funded union time (TFUT), collective bargaining costs, and other labor relations data points?

**A13:** Yes. Please continue to collect and timely submit agency labor relations data as requested, even if the agency or subdivision therein is now exempted from the provisions of the FSLMRS.

**\*Q14:** What should we do with agreements that are pending Agency Head Review (AHR) and cover newly excluded agencies, subdivisions, or partial groups?

**\*A14:** For bargaining units represented by NTEU and impacted by *Exclusions,* agencies should exercise their agency head authority under 5 U.S.C. § 7114(c) to disapprove any agreement currently undergoing review for units that are no longer recognized within a covered agency or subdivision. Agencies should cite to *Exclusions* or, if applicable, the presidential memorandum [Limiting Lame-Duck Collective Bargaining Agreements That Improperly Attempt to Constrain the New President](), as their basis for disapproval. For agreements that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct AHR as they normally would. Lastly, for agreements that include a mix of excluded and included units, agencies should continue AHR and include a note that the agreement only covers those not excluded by *Exclusions* and that the agreement has no applicability to other employees.

For all other bargaining units including those represented by NTEU who are impacted only by *Further Exclusions*, agencies need not continue reviewing such agreements as they are no longer bound by the federal labor statute. However, agencies may, out of an abundance of caution, exercise their agency head authority to disapprove any agreements pending AHR.

**\*Q15:** For agencies that are currently bargaining with unions, are there any concerns with solidifying and executing agreements such as tentative agreements or memoranda of understandings or agreements (MOUs or MOAs)?

**\*A15:** For bargaining units represented by NTEU and impacted only by *Exclusions*, Agencies should suspend such negotiations until the conclusion of litigation, meaning bargaining sessions should be placed on hold along with implementation of changes to conditions of employment that were being bargained. Where agencies need only execute an agreement through a ministerial act (e.g., signing an agreement), agencies may proceed to do so provided that any such agreement is consistent with the policy priorities of the Trump Administration. For bargaining units represented

by all other unions, agencies should withdraw from negotiations.

**Q16:** In Section 2 of *Exclusions,* 1-419 states: "The following agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code, the Social Security Administration, and the Office of Personnel Management: (a) Office of the Chief Information Officer (OCIO). (b) any other agency or subdivision that has information resources management duties as the agency or subdivision's primary duty." Does this apply to all OCIO offices within an agency not listed in *Exclusions*?

**A16:** This provision applies only to CIO offices in the Executive Departments (*see* 5 U.S.C. 101), OPM, and the Social Security Administration, as well as the subordinate agencies and offices under those Departments/agencies.

**Q17**: What does information resources management mean as used in Section 2 of *Exclusions*?

**A17**: The Paperwork Reduction Act defines "information resources management" at 44 U.S.C. § 3502(7), as "the process of managing information resources to accomplish agency missions and to improve agency performance, including through the reduction of information collection burdens on the public."

## April 22, 2025 Additional Questions and Answers

**Q18:** How should agencies handle union time and office space provided to union representatives who are no longer in a recognized unit?

**A18:** Agencies and subdivisions covered by *Exclusions* and *Further Exclusions* must reclaim any agency space, furniture, equipment (e.g., computers, phones), and other resources previously utilized by labor unions for representational activities and repurpose those resources for agency business only. Employees of covered agencies and subdivisions who were previously authorized to use taxpayer-funded union time are no longer permitted use of such time and should only be conducting agency-assigned work during their scheduled duty time. Supervisors should not approve any time and attendance records that include requests for and use of taxpayer-funded union time. For agencies and subdivisions not subject to exclusion from collective bargaining, agencies can allow for use of union time and office space as they normally would.

**\*Q19:** What if an arbitration is already scheduled for an agency or subdivision now excluded under *Exclusions* and *Further Exclusions*?

**\*A19:** For arbitrations between an agency and an NTEU bargaining unit impacted by *Exclusions* only, the agency should request that the arbitrator hold the case in abeyance pending the outcome of litigation regarding *Exclusions*. If unable to delay the hearing, the agency should take the position that in accordance with *Exclusions* and *Further Exclusions,* the union is no longer the exclusive representative and there is no jurisdiction before the arbitrator.

For all other arbitrations between an agency and any other labor union, agencies should withdraw from the proceeding and pay arbitrators for any work already performed.

**\*Q20:** How do *Exclusions* and *Further Exclusions* impact unions' consultation rights under the FSLMRS?

**\*A20:** The FSLMRS grants labor unions consultation rights under 5 U.S.C. §§ 7113 and 7117(d)

on substantive changes to conditions of employment at the national, subnational, and government-wide basis, respectively. Agencies should assess and determine whether labor unions meet the requirements under 5 C.F.R. Part 2426 and take appropriate action with the appropriate FLRA Regional Office where it believes labor unions no longer meet the eligibility criteria for consultation rights. Agencies should begin to assess the impact of *Exclusions* and *Further Exclusions* on unions holding governmentwide or national consultation rights. Before taking action, agencies should consult their General Counsel and coordinate with the Department of Justice.

*\*Q21:* Section 7 of *Exclusions* requires all agency heads with employees covered by Chapter 71, to identify any agency subdivisions with a primary function of intelligence, counterintelligence, investigative, or national security work, that are not covered by Executive Order 12171, as amended. Does this only apply to agencies defined in 5 U.S.C. 101?

*\*A21:* Section 7 is not limited to those agencies defined under 5 U.S.C. 101 or those listed in *Exclusions*. Rather, every agency head should review their respective missions and identify any subdivisions with a primary function of intelligence, counterintelligence, investigative, or national security work.

**Q22:** Some employees no longer have union dues or other fees deducted from their government paychecks for union-provided benefits/insurance (e.g., dental, vision, etc.). Is this cessation of payroll deductions considered a life-changing event that would allow employees to opt into federal benefits coverage?

**A22:** Employees should consult with the union or insurance provider from whom they were receiving benefits (i.e., non-FEDVIP plans) regarding coverage questions. If confirmed to have lost coverage, this would be considered a Qualifying Life Event that allows enrollment in a FEDVIP plan outside of Open Season. The individual has from 31 days before to 60 days after the event to enroll. More information is available here: Dental and Vision | BENEFEDS.

**Q23:** May agencies communicate with unions representing employees who are still recognized under Executive Order 14251 (e.g., police officers, security guards, firefighters) or otherwise still recognized under 5 U.S.C. 71?

**A23:** Yes. Unions who have bargaining unit employees that are not excluded under the Executive Order, maintain recognition under Chapter 71 of Title 5, U.S. Code. Therefore, normal labor-management communication and engagement should continue.

*\*Q24:* How should an agency handle an impending change in conditions of employment for employees now excluded by the Executive Order? How should an agency respond to a union inquiry regarding a change in conditions of employment?

*\*A24:* An agency or subdivision covered by *Exclusions* and *Further Exclusions* can implement the change without completing negotiations. Agencies may respond to a demand to bargain from a bargaining unit represented by NTEU that is impacted by *Exclusions* only by acknowledging receipt and informing the union that it will hold in abeyance their request pending the outcome of litigation over Executive Order 14251. For all other labor unions, agencies may proceed with implementing changes without first engaging in or completing collective bargaining.

*\*Q25:* What should an agency do if it receives a grievance from the union for an individual or unit that is no longer recognized in accordance with *Exclusions* and *Further Exclusions*?

**\*A25:** For units represented by NTEU and impacted by *Exclusions* only that are no longer recognized within a covered agency or subdivision, agencies should acknowledge receipt, inform the union that the grievance is being held in abeyance pending litigation for *Exclusions*, and provide a date the agency plans to update them. For units represented by any other labor union, the agency should disregard the grievance and inform the individual employee that he or she may proceed to file an administrative grievance, if applicable.

For grievances that include positions not subject to exclusion from collective bargaining (e.g., police officers, security guards, firefighters), agencies should conduct their negotiated grievance procedures as they normally would.

**\*Q26:** Should an agency continue to allow union representation in Weingarten meetings and formal discussions with employees excluded under Executive Order 14251?

**\*A26:** No. Agencies should continue to invite unions to formal discussions and honor requests for Weingarten meeting representation only for employees not excluded from collective bargaining under *Exclusions*.

**\*Q27:** If a CBA is set to rollover for units no longer recognized, but the agreement has also not been terminated, what do we do?

**\*A27:** For CBAs between an agency and bargaining units represented by NTEU impacted by *Exclusions* only, in this circumstance, the agency may notify the union that it is terminating the CBA and that any negotiations regarding a successor agreement are being held in abeyance due to *Exclusions* and associated litigation. For all collective bargaining agreements between an agency and labor union no longer recognized as a result of *Exclusions* or *Further Exclusions*, agencies should formally terminate the CBA by notifying the labor union. No other action is required.

**Q28:** If an agency notified a union prior to *Exclusions* and *Further Exclusions* that it was terminating a labor-management forum and the union requests to negotiate, how should the agency respond?

**A28:** On March 27, 2025, OPM issued guidance requiring agencies to abolish labor-management forums, committees, and councils at the agency-wide and organizational levels. Many of these forums were established under Executive Order 14119, which was rescinded under Executive Order 14236 on March 2025. The guidance also noted that where the establishment or use of labor-management forums, committees, and councils are incorporated into the terms of any CBA, agencies should seek to renegotiate those terms at the earliest practicable juncture consistent with the policies of this Administration. If a unit that is no longer recognized under *Exclusions* and *Further Exclusions* seeks to negotiate over the termination of a forum, the agency should deny the request to bargain since the unit is no longer recognized.

**Q29:** The agency has received unsolicited messages from unions requesting consideration under Section 4 of *Exclusions*, which requires the Departments of Defense and Veterans Affairs to submit any suspensions of *Exclusions* application to the Federal Register within 15 days of the order. How should the agency respond?

**A29:** The agency should acknowledge receipt only and not make any statements regarding the substance of the communication.

**Q30:** Are all OCIOs or equivalents excluded from collective bargaining?

**A30:** Executive Order 14251 excludes the OCIO in "agencies or subdivisions of each Executive department listed in section 101 of title 5, United States Code," and in the Social Security Administration and OPM.

**\*Q31:** Should agencies respond to union Requests for Information (RFIs) from units that are now excluded in accordance with the *Exclusions* and *Further Exclusions* order?

**\*A31:** For bargaining units represented by NTEU impacted by *Exclusions* only, if the RFI is filed as a request under 5 U.S.C. 7114(b)(4), agencies should hold the request in abeyance pending the outcome of the litigation. For all other bargaining units, agencies should notify the labor union that they are excluded from coverage under the federal labor statute under E.O. 14251 and, therefore, not entitled to information subject to the RFI.

**Q32:** How should agencies respond to questions regarding union dues?

**A32:** If an excluded employee asks about continuing union dues, the agency should inform the employee that union dues allotments through a government payroll provider are not authorized at this time and that if they wish to continue paying union dues nonetheless, they may contact their union.

**\*Q33:** How should agencies handle union dues allotments?

**\*A33:** In taking steps to implement *Exclusions* and *Further Exclusions*, agencies should seek to end the collection of union dues allotments for those agencies or subdivisions identified in *Exclusions* and *Further Exclusions*. However, agency payroll providers should not unilaterally terminate all union dues allotments without first consulting with their customer agencies. Instead, agency payroll providers should contact their customer agencies to identify which labor unions and employees are excluded from collective bargaining by *Exclusions* and *Further Exclusions* and limit the termination of dues allotments to those unions and employees.