UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------ x

NATIONAL COUNCIL OF PRISON
LOCALS, *et al.*,

                Plaintiffs,

    -against-

FEDERAL BUREAU OF PRISONS, *et al.*,

                Defendants.

------------------------------------------------------------------ x

**MEMORANDUM & ORDER DENYING DEFENDANTS' MOTION TO DISMISS AND MOTION TO TRANSFER**

3:25-CV-1907 (VDO)

**VERNON D. OLIVER**, United States District Judge:

This case arises from the abrupt termination of the collective bargaining agreement ("CBA") between the Federal Bureau of Prisons ("BOP") and the National Council of Prison Locals, American Federation of Government Employees ("CPL-33"). AFGE Local 1661 ("Local 1661") is the local chapter of CPL-33 for BOP employees at the Federal Correctional Institution, Danbury ("FCI Danbury"). Local 1661's members were covered by the CBA. On September 25, 2025, the Director of the BOP, William K. Marshall, III, terminated the CBA "effective immediately"—approximately four years before it was set to expire. In the termination letter, Director Marshall stated that the termination was to carry out Executive Order 14,251 ("EO 14,251" or the "Executive Order"), which exempted BOP and other agencies from the collective bargaining requirements of the Federal Service Labor-Management Relations Statute ("FSLMRS"). In response, CPL-33 and Local 1661 (collectively, "Plaintiffs") filed the instant matter against the BOP and Director Marshall (collectively, "Defendants" or the "Government"), seeking (1) a declaration that the recission of the CBA violated the Administrative Procedure Act and the First Amendment, and (2) injunctive relief reinstating the CBA.

Before the Court are two motions Defendants filed in response to the complaint: a motion to dismiss, or in the alternative, to stay proceedings (the "Motion to Dismiss")[1]; and a motion to transfer the case to the United States District Court for the District of Columbia (the "Motion to Transfer").[2] For the reasons explained below, Defendants' motions are **DENIED**.

## I.   BACKGROUND[3]

### A.   Factual Background

#### 1.   CPL-33, Local 1661, and the CBA

As mentioned, CPL-33 is a labor organization affiliated with the American Federation of Government Employees ("AFGE"). It represents a bargaining unit of approximately 30,000 civil servants employed by the BOP. It is headquartered in Arkansas and divided into six geographical regions consisting of over more than 100 locals across the United States. Under its current name, CPL-33 has been the exclusive bargaining representative for BOP employees since 2006.[4] CPL-33 provides services to its members, including collective bargaining with BOP to obtain the CBA, filing and negotiating grievances against the agency, and providing training to the local chapters.[5] Local 1661 is the local chapter of CPL-33 for employees at FCI Danbury. Its members are covered by the CBA between CPL-33 and BOP.[6]

---

[1] ECF No. 40.

[2] ECF No. 41.

[3] The Court accepts all factual allegations in the Complaint as true for the purposes of deciding the Motion to Dismiss and Motion to Transfer. *See Dethier v. Natl. Liquidators*, No. 09-CV-1507 (WWE), 2010 WL 991573, at *1 (D. Conn. Mar. 18, 2010) ("For purposes of ruling on a motion to dismiss or to transfer venue, the Court accepts all allegations of the complaint as true.").

[4] Complaint, ECF No. 1 ¶ 13.

[5] *Id.* ¶ 14.

[6] *Id.* ¶ 15.

As part of its responsibility to negotiate the CBA, on November 1, 2024, CPL-33 came to an agreement with the BOP to extend the CBA through May 28, 2029.[7] The CBA guaranteed BOP employees certain rights and protections. For instance, it set terms for overtime and sick leave, imposed safety and health requirements, provided for an Employee Assistance Program, set hours of work, and established the seniority of members.[8] It also provided for official time, which allowed union representatives to prepare for and participate in proceedings on behalf of workers during government time.[9]

Another core function of CPL-33 is advocating for its members on Capitol Hill regarding matters such as improved working conditions and funding for staff and facilities.[10] For instance, between March 2025 and September 2025, CPL-33 went to Capitol Hill for advocacy activities on six occasions. During one of those trips in June, the focus of the union's advocacy was opposing cuts to employee salaries and retirement benefits, as outlined in the One Big Beautiful Bill Act.[11] Union representatives also voiced opposition to those cuts in posts on social media.[12]

### 2.    EO 14,251 and FSLMRS

Enacted in 1978, the FSLMRS establishes a framework governing labor-management relations in federal agencies. It provides for collective bargaining between federal agencies and unions, and it bars each from committing unfair labor practices. *See* 5 U.S.C. § 7101, *et*

---

[7] *Id.* ¶ 18.

[8] *Id.* ¶ 19.

[9] *Id.* ¶¶ 19, 21.

[10] *Id.* ¶ 23.

[11] *Id.*

[12] *Id.*

*seq.* On March 27, 2025, President Donald Trump signed EO 14,251, which exempted dozens of federal agencies from the requirements of the FSLMRS because those agencies "had as a primary function intelligence, counterintelligence, investigative, or national security work" and the FSLMRS could not be applied to the agencies "in a manner consistent with national security requirements and considerations."[13] The BOP is one of the agencies that the President sought to exempt from the FSLMRS's coverage under EO 14,251.[14] However, EO 14,251 did not state that agencies were compelled to terminate existing CBAs, and it did not mandate that the CPL-33 CBA be terminated before its expiration date of May 28, 2029.[15]

The validity of EO 14,251 has been the subject of significant, widespread litigation across the United States.[16]

### 3.    Post-Executive Order, Pre-Termination

Although EO 14,251 was issued on March 27, 2025, BOP did not terminate its CBA with CPL-33 until approximately six months later, on September 25, 2025 (the "CBA Termination Date"). For some of the time following the issuance of the Executive Order, the implementation of EO 14,251 was enjoined on First Amendment grounds by the Northern District of California.[17] On August 1, 2025, however, the Ninth Circuit stayed the district

---

[13] *Id.* ¶ 24; *see also* EO 14,251 § 1(a).

[14] ECF No. 1 ¶ 25; *see also* EO 14,251 § 2(b) (laying out the Department of Justice as one of the agencies affected by the Executive Order, of which the BOP is part of).

[15] ECF No. 1 ¶¶ 26, 31; *see generally* EO 14,251.

[16] ECF No. 1 ¶¶ 29–36; *see e.g.*, *AFGE v. Trump*, No. 25-CV-3070, ECF No. 1 (N.D. Cal. Apr. 3, 2025) ("*AFGE II*"); *U.S. Dep't of Def. v. AFGE, AFL-CIO, District 10*, No. 25-CV-119, ECF No. 1 (W.D. Tex. Mar. 28, 2025).

[17] ECF No. 1 ¶ 36; *see also AFGE v. Trump*, No. 25-CV-3070, 2025 WL 1755442 (N.D. Cal. June 24, 2025).

4

court's injunction.[18] Between the date of the Ninth Circuit stay and the CBA Termination Date, BOP continued to engage in actions required by the CBA.[19] The  agency continued to hold Labor Management Relations meetings at the local level across the country, as anticipated by the CBA.[20] It continued to notify employees of their right to union representation in disciplinary meetings and interviews.[21] It continued to negotiate with the union directly on a variety of issues.[22] And it engaged with the union on numerous obligations under the CBA by seeking union input on staffing plans, approving official times for union representatives, and providing program statements for union review. BOP also included union representatives in senior meetings across the agency during this time period.[23]

On August 13, 2025, following the Ninth Circuit's stay, the Office of Personnel Management issued a revised Frequently Asked Questions Document concerning EO 14,251. It stated, in relevant part, that "[a]gencies may choose to terminate, abrogate, or repudiate CBAs with other [non-NTEU] unions, and should consult with their General Counsels to assess next steps regarding those CBAs."[24]

---

[18] ECF No. 1 ¶ 36; *see also AFGE v. Trump*, No. 24-4014, at ECF No. 32 (9th Cir. Aug. 1, 2025).

[19] ECF No. 1 ¶ 40.

[20] *Id.* ¶ 41.

[21] *Id.* ¶ 43.

[22] *Id.* ¶ 44.

[23] *Id.* ¶¶ 47, 48.

[24] *Id.* ¶ 38.

### 4.    Termination

Director Marshall abruptly terminated the CBA on September 25, 2025, with no advance notice to CPL-33.[25] That day, he publicized the termination in two ways: by sending a formal letter to CPL-33, and by separately posting a "Message from the Director" on BOP's website.[26]

The letter to CPL-33 stated that "based on [EO 14,251] and as of the date of this notice, [BOP] no longer recognizes [CPL-33] as the exclusive representative for employees of the existing bargaining unit."[27] It then listed four actions being taken. First, Director Marshall was terminating the CBA and other agreements between BOP and CPL-33. Second, union dues would no longer be deducted from employees' pay.[28] Third, union officials could no longer request or be granted official time pursuant to the FSLMRS or any CBAs.[29] Fourth, employees no longer had the right to union representation at formal discussions, investigatory interviews, third party proceedings, or in any other situation.[30] The letter did not tie the BOP's decision to EO 14,251. It did not state that terminating the CBA was  required by the Executive Order, nor did it provide any explanation of why termination was necessary to effectuate the purposes of the Executive Order.[31]

---

[25] *Id.* ¶ 49.

[26] *Id.* ¶¶ 50, 52.

[27] *Id.* ¶ 50.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.* ¶ 51.

The same day Director Marshall sent the letter, he posted a "Message from the Director" on BOP's website. That message reads, in its entirety:

For too long, the Federal Bureau of Prisons has been ranked among the worst places to work in the federal government. That's unacceptable and that demands change.

My commitment is clear: make life better for every person who works here. Better conditions. Better policies. A better future.

CPL-33 has a proud history of advocating for its members, and I want to acknowledge the positive contributions it has made over the years. Many dedicated people have given their time and energy under this contract, and I respect the intent behind that work. But the truth is, despite those efforts, we have not seen the progress we need. The current contract has too often slowed or prevented changes that would have made your jobs safer and your workdays better. This is not about questioning the value of representation; it's about ensuring representation moves us forward, not holds us back.

I grew up in West Virginia. My family has always been pro-union. The coal miners and steel workers I knew stood together, fought for safer conditions, and made life better for their families. That's the kind of union I will always support. But when a union becomes an obstacle to progress instead of a partner in it, it's time for change. And today, thanks to President Donald J. Trump and Attorney General Pamela Bondi, we're making that change. Today, I'm announcing the termination of our contract with CPL-33 effective immediately.

I want to be absolutely clear about what this means.

- Your job security is protected by civil service law. You will not be removed, suspended, or demoted without cause and due process.

- Your pay and benefits, including your salary, retirement, health insurance, overtime, leave accrual, and uniform allowance, are guaranteed by law and remain.

- Your civil service protections, including whistleblower rights, appeal rights, and anti-discrimination protections, remain fully in place.

- Your safety remains my priority. Our legal obligation to provide a safe and secure workplace does not change.

In the coming days, we will spell out exactly how we move forward from here but the bottom line is CPL-33 didn't give you your protections, the law did, and Bureau policy continues them.

7

Those safeguards aren't going anywhere. This isn't about taking things away, it's about giving you more. More clarity. More fairness. More respect.

The whole purpose of ending this contract is to make your lives better. Period.

Every time I change an old practice, I'm asking one question first: Does this make life better for my staff? If the answer is no, it doesn't happen. If the answer is yes, we move and we move fast.

We will move forward with solutions that work, without roadblocks, without excuses, and with one goal: to make the Bureau a place where people are proud to serve.

This is our moment to build something better. And we will. Now, let's get to work.

William K. Marshall, III
Director
Federal Bureau of Prisons[32]

Following the termination of the CBA, CPL-33 representatives and bargaining unit employees have become increasingly hesitant to engage in activity that is or could be perceived as being contrary to the policies of the Trump presidential administration.[33]

### B.    Procedural History

On November 13, 2025, plaintiffs CPL-33 and Local 1661 filed their Complaint, alleging two causes of action: first, that BOP's termination of the CBA between BOP and CPL-33 was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"); and second, that the termination was impermissible retaliation in violation of the First Amendment.[34] The following month, on December 22, 2025, Plaintiffs filed a motion for

---

[32] *Id.* ¶ 52.

[33] *Id.* ¶ 55.

[34] *See* ECF No. 1.

preliminary injunction ("PI Motion").[35] Defendants then filed the Motion to Dismiss on February 13, 2026, which operated as an omnibus motion to dismiss, a motion to stay, and a response to the PI Motion.[36]  That same day, Defendants also filed a Motion to Transfer this case to the District Court for the District of Columbia.[37] Plaintiffs responded to the Motion to Dismiss and Motion to Transfer on March 6, 2026,[38] and Defendants replied on March 20, 2026.[39]

## II.   **<u>MOTION TO DISMISS</u>**

In the Motion to Dismiss, Defendants assert three grounds for dismissal of the Complaint: (1) Plaintiffs claims are channeled to the Federal Labor Relations Authority ("FLRA"), depriving the Court of subject matter jurisdiction; (2) this case was impermissibly split from *AFGE II*; and (3) the Court should dismiss the case pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. The Court addresses and rejects each of those arguments below.

### A.   **Claim Channeling**

Defendants first argue that the Court lacks subject matter jurisdiction over this action because Congress has channeled Plaintiffs' claims to the FLRA.[40] The Court disagrees.

In the FSLMRS, Congress established a review scheme for resolving disputes between unions and agencies. *See* 5 U.S.C. § 7105*, et. seq*. Under that review scheme, the FLRA is

---

[35] *See* ECF No. 28.

[36] *See* ECF No. 40.

[37] *See* ECF No. 41.

[38] *See* ECF Nos. 48, 49.

[39] *See* ECF Nos. 50, 51.

[40] ECF No. 40-1 at 13–20.

charged with reviewing agency actions and disputes within the federal workforce, including negotiability disputes and unfair labor practice disputes. *AFGE Local 2305 v. U.S. Dep't. Veterans Affs.*, No. 25-CV-583, 2026 WL 709856, at *2 (D.R.I. Mar. 13, 2026), *enforced*, No. 25-CV-583, 2026 WL 847245 (D.R.I. Mar. 27, 2026); *see also* 5 U.S.C. § 7105(a). Congress, in the FSLMRS, required litigants to bring their claims in the first instance to the FLRA. *See* 5 U.S.C. § 7105(a). And the review scheme established under the FSLMRS is the exclusive path to review "with respect to claims *within its scope.*" *AFGE, AFL-CIO v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) (emphasis added).

Here, Plaintiffs' claims are expressly outside of the scope of the FSLMRS because EO 14,251 removed BOP from the statute's coverage. In issuing EO 14,251, President Trump determined that "Chapter 71 of title 5, United States Code [the FSLMRS] cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." EO 14,251 § 1. Thus, he explicitly excluded the listed agencies, including the DOJ (of which BOP is a part), from coverage under the FSLMRS. "As a result, [BOP] employees, and their unions as representatives, are no longer covered by the statute" and they cannot bring claims through the review scheme Congress established under the FSLMRS. *AFGE, AFL-CIO v. Trump*, 792 F. Supp. 3d 985, 998–99 (N.D. Cal. 2025), *jurisdictional ruling aff'd, rev'd on other grounds*, No. 25-4014, 2026 WL 534591 (9th Cir. Feb. 26, 2026); *see also AFGE Local 2305*, 2026 WL 709856, at *3 (holding that similar claims challenging the application of EO 14,251 were not channeled to the FLRA). As the Ninth Circuit recently explained, "[i]n these circumstances, it is not 'fairly discernible that Congress precluded district court jurisdiction' over [BOP's] claims." *AFGE, AFL-CIO v.*

10

*Trump*, 167 F.4th 1247, 1255–56 (9th Cir. 2026) (quoting *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012)).

Further, the FLRA has consistently found that it lacks jurisdiction to consider cases brought by a union against an agency excluded from FSLMRS coverage. *See U.S. Dep't of the Air Force Air Force Materiel Command Warner Robins Air Logistics Ctr. Robins Air Force Base, Georgia & AFGE Loc. 987*, 66 F.L.R.A. 589, 598 (Apr. 20, 2012); *Dep't of the Navy, Naval Telecomms. Ctr., Ward Circle & NAVTELCOM Unit Local No. 1, AFGE*, 6 F.L.R.A. 498, 500 (1981) ("Where the President has specifically excluded an agency from coverage under the Statute by issuing an executive order, the Authority is clearly without jurisdiction to process a representation petition."). An attempt by Plaintiffs to use the FLRA as a forum would be futile, given the FLRA's extensive history of dismissing similar claims on jurisdictional grounds. While, of course, Plaintiffs could appeal the FLRA's decision to a circuit court, that court's review is limited to the record created by the FLRA. *See AFGE Local 2305*, 2026 WL 709856, at *3. As the FLRA is likely to dismiss the claims on jurisdictional grounds, it would not reach the substance of Plaintiffs' claims, and the substantive claims would not have been adjudicated and would therefore not be ripe for circuit court review. *Id.* Thus, channeling Plaintiffs' claims to the FLRA would deprive them of a forum to seek adjudication of their claims on the merits.

The Government attempts to distinguish this case from other litigation that challenges EO 14,251 itself because Plaintiffs challenge the termination of the CBA, not the validity of the Executive Order.[41] Many of the courts that have denied claim channeling arguments

---

[41] ECF No. 40-1 at 14.

concerning EO 14,251 have done so in the context of considering whether the Executive Order should remain in effect. *See, e.g.*, *AFGE, AFL-CIO*, 2026 WL 53491, at *5. Thus, the Government argues, the more discrete issue of whether the CBA was properly terminated in accordance with EO 14,251 is still within the FLRA's jurisdiction because it concerns a matter related to union representation.[42]

The Government is incorrect. Plaintiffs' claims challenging CBA termination cannot proceed through the review scheme established by the FSLMRS because EO 14,251 removed BOP from the statutes' coverage. It is logically untenable that the FLRA would retain exclusive jurisdiction over disputes concerning the termination of a CBA when the CBA was terminated in accordance with an Executive Order that stated the FSLMRS "cannot be applied to these agencies and agency subdivisions in a manner consistent with national security requirements and considerations." EO 14,251 § 1. Because the Executive Order removed the BOP from coverage under the FSLMRS, the Government cannot now rely on the review scheme created by Congress in the FSLMRS to channel Plaintiffs' claims into a dead end. Accordingly, claims of CBA termination by unions at agencies excluded from FLMRS coverage by EO 14,251 are not channeled to the FLRA, and this Court retains jurisdiction. *See AFGE Local 2305*, 2026 WL 709856, at *2; *United Nurses Ass'n Cal. v. Dep't Veterans Affs.,* No. 25-CV-674, 2026 WL 851188, at *3 (D.R.I. Mar. 27, 2026).

### B.    Claim Splitting

After President Trump signed EO 14,251, numerous unions filed suit challenging its validity. In one such case in the Northern District of California, *AFGE II*, the lead plaintiff is

---

[42] *Id.*

AFGE, the parent organization of the Plaintiffs. No. 25-CV-3070, ECF No. 1 (N.D. Cal. April 3, 2025). The defendants in that case include the Department of Justice, of which the BOP is a sub-agency, and the U.S. Attorney General. *Id.* The case was commenced on April 3, 2025, approximately six months before the termination of the CBA on September 25, 2025. In the Motion to Dismiss, Defendants invoke the doctrine of claim splitting to argue that the Court should dismiss the instant case because it is impermissibly split from *AFGE II*.[43] The Court disagrees: Plaintiffs' claims were unavailable when *AFGE II* was filed, and accordingly, the Court will not dismiss them as duplicative.

"As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000). Claim splitting, also known as the rule against duplicative litigation, borrows analysis from the doctrine of claim preclusion to "assess whether the second suit raises issues that should have been brought in the first." *Davis v. Norwalk Econ. Opportunity Now, Inc.*, 534 Fed. Appx. 47, 48 (2d Cir. 2013) (summary order) (quoting *Curtis*, 226 F.3d at 139–40). Thus, to determine whether one case is impermissibly split from another, courts consider whether the two cases arise from the same "nucleus of operative fact." *Id.* (quoting *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105, 108 (2d Cir.2000)). However, the claim-splitting doctrine only bars claims that could have been brought in the earlier-filed case. *See Curtis*, 226 F.3d at 139 (holding that a district court abused its discretion in dismissing a case as duplicative because the claims could not have been brought in the earlier-filed suit). Indeed, "courts dismissing duplicative claims have done so where the claims not only arise out

---

[43] ECF No. 40-1 at 20–25.

of a common nucleus of operative fact, but where the claims also accrue at the same time or at least within the period where amendment as of right is still available." *Murray v. UBS Secs., LLC*, No. 14-CV-927, 2015 WL 769586, at *4 (S.D.N.Y. Feb. 24, 2015) (collecting cases). This is because a plaintiff is not required to constantly amend its complaint to adjust for evolving events, rather the "plaintiff may simply bring a later suit on those later-arising claims." *Curtis*, 226 F.3d at 139.

Here, Director Marshall terminated the CBA approximately six months after the national AFGE initiated *AFGE II* in the Northern District of California. And Plaintiff alleges that the termination was in response to speech by CPL-33 from the period between March and June 2025. Thus, the facts giving rise to Plaintiffs' claims occurred well after the filing of *AFGE II*, and they could not have been brought at the same time. The plaintiffs in *AFGE II* were not required to disrupt ongoing litigation to amend their complaint to incorporate the instant claims brought CPL-33 and Local 1661. Indeed, Director Marshall terminated the CBA after the AFGE secured a preliminary injunction in *AFGE II*, after the case had gone on appeal to the Ninth Circuit, and after the Ninth Circuit had stayed the preliminary injunction. Requiring the *AFGE II* plaintiffs to amend their complaint at that point in the litigation would be needlessly disruptive and antithetical to Second Circuit precedent. Accordingly, CPL-33 and Local 1661 appropriately brought their later-arising claims in this separate, later-filed suit.

### C.    12(b)(6) Motion to Dismiss for Failure to State a Claim

Defendants next move to dismiss Plaintiffs' claims under Rule 12(b)(6) of the Federal Rules of Civil procedure.

### 1. Legal Standard

A party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When considering a Rule 12(b)(6) motion, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). "[T]he court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief." *Leonard v. Gen. Motors L.L.C.*, 504 F. Supp. 3d 73, 83 (D. Conn. 2020).

## 2.    First Amendment Claims

First, Plaintiffs sufficiently allege that the BOP's and Director Marshall's termination of the CBA violated the First Amendment, both as retaliation for protected speech and as viewpoint discrimination.[44]

### a.    Retaliation

To establish a *prima facie* case of First Amendment retaliation, a plaintiff must demonstrate that "(1) its conduct was constitutionally protected and (2) that same conduct was a substantial or motivating factor in the defendant's decision to undertake the challenged actions." *NRA v. Vullo*, 144 F.4th 376, 387 (2d Cir. 2025), *cert. denied sub nom*. No. 25-479, 2026 WL 490650 (Feb. 23, 2026). After a plaintiff establishes the *prima facie* case, "the defendant may rebut those allegations by showing that 'it would have reached the same decision . . . even in the absence of the protected conduct.'" *Id.* (quoting *Mt. Healthy v. Doyle*, 429 U.S. 274, 287 (1977)). The final factor "establishes what is known as a *Mt. Healthy* defense," and courts "need not—and do not—consider the viability of any *Mt. Healthy* defense" at the motion to dismiss stage. *Id.* at 388.

Plaintiffs meet the first factor because they engaged in constitutionally protected activism on behalf of their members. CPL-33 regularly advocates for its members on Capitol Hill regarding matters such as improved working conditions and funding for staff and facilities. CPL-33 representatives went to Capitol Hill on six different occasions between March and

---

[44] In their response to the Motion to Dismiss, Plaintiffs clarify that they brought their First Amendment claims as freestanding equitable causes of action for constitutional violations, not pursuant to the APA. ECF No. 48 at n.17. The Court appreciates the clarification and construes the claim as such. The Complaint has a subheading for the First Amendment count that states, "Contrary to Constitution Right, 5 U.S.C. § 5 U.S.C. 706(2)(B)." This seems to be a clerical error, and the substance of the First Amendment count does not seek relief under the APA.

September of 2025 to represent BOP interests. In June, during one of those trips, the focus of CPL-33's advocacy was opposing cuts to employee salary and retirement benefits outlined in the One Big Beautiful Bill Act. Union representatives also voiced opposition to those cuts in posts on social media. All of these attempts to influence legislation are protected by the First Amendment. *See Juster Associates v. City of Rutland.,* 901 F.2d 266, 271 (2d Cir. 1990) ([A]ttempts to influence legislation [are] an inherent part of the political process protected by the First Amendment[.]").

As to the second factor, Plaintiffs have sufficiently alleged that their activism was a substantial or motivating factor in Director Marshall's decision to terminate the CBA. To do so, Plaintiffs rely on the "Message from the Director," which was posted on the same day Director Marshall terminated the CBA. In it, Director Marshall states that "CPL-33 has a proud history of advocating for its members," but its advocacy has not resulted in sufficient progress because the "current [CBA] has too often slowed or prevented changes."[45]  Director Marshall goes on to state:

> I grew up in West Virginia. My family has always been pro-union. The coal miners and steel workers I knew stood together, fought for safer conditions, and made life better for their families. That's the kind of union I will always support. But when a union becomes an obstacle to progress instead of a partner in it, it's time for change.[46]

He also accuses CPL-33 of having "slowed or prevented changes" and creating "roadblocks."[47] The Message from the Director does not cite national security concerns as the reason for termination. Rather, it laments on the fact that CPL-33 is not the "kind of union" Director

---

[45] ECF No. 1 ¶ 52.

[46] *Id.*

[47] *Id.*

Marshall supports, and that CPL-33 has become "an obstacle to progress." This is sufficient to demonstrate that BOP's termination of the CBA was substantially motivated by Plaintiffs' First Amendment protected activity.

Following the guidance of the Second Circuit, the Court will not take up the final factor, the *Mt. Healthy* defense, on a motion to dismiss. Plaintiffs have established a *prima facie* case of First Amendment retaliation. Accordingly, the Court **denies** Defendants' motion to dismiss this claim.

### b.   Viewpoint Discrimination

Plaintiffs also sufficiently state a claim of viewpoint discrimination. "Viewpoint-based restrictions target 'a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.'" *U. at Buffalo Young Americans for Freedom v. U. at Buffalo Student Assn. Inc.*, No. 25-140, 2025 WL 3075633, at *3 (2d Cir. Nov. 3, 2025) (summary order) (quoting *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 281 (2d Cir. 1997)). A government official may not engage in viewpoint discrimination by using the "power of her office to punish or suppress disfavored expression." *Natl. Rifle Assn. of Am. v. Vullo*, 602 U.S. 175, 176 (2024).

Here, Director Marshall did not express that unionization itself impeded national security or prevented BOP from accomplishing its mission—the problem was CPL-33's specific advocacy and viewpoints. Namely, CPL-33 repeatedly spoke out against the Trump administration's policies and proposed legislation. Director Marshall referred to this in his "Message from the Director," where he advertised that he terminated the CBA because CPL-33 was not the "kind of union" he supports, and the union was an "obstacle to progress instead of a partner in it." Presumably referring to CPL-33's advocacy, Director Marshall also stated

18

that it "slowed or prevented changes" and created "roadblocks." While the BOP is certainly within its rights to terminate the CBA in accordance with EO 14,251 for national security concerns, it may not do so to punish or suppress disfavored speech. Accordingly, at the motion to dismiss stage, Plaintiffs have stated a claim of viewpoint discrimination.

### 3.    APA – Arbitrary and Capricious

Defendants next seek to dismiss Plaintiffs' claim that BOP's termination of the CBA was arbitrary and capricious under the APA. First, Defendants argue that the termination of the CBA was mandated, not discretionary under EO 14,251, and thus the termination was a presidential action not subject to review under the APA. Alternatively, Defendants argue that the Court should dismiss this claim because the termination decision was committed to agency discretion by law. And finally, Defendants argue that the decision to terminate was not pretextual—it was done pursuant to EO 14,251, despite Director Marshall's alternative justification in the "Message from the Director."

The Motion to Dismiss is not the appropriate mechanism for reviewing the merits of Plaintiffs' arbitrary and capricious claim in the first instance. Rather, "summary judgment is ordinarily the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard." *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, No. 21-CV-3184, 2024 WL 2699924, at *2 (D.D.C. May 24, 2024) (cleaned up); *see, e.g. Kapoor v. U.S. Citizenship and Immig. Servs.*, 763 F. Supp. 3d 247, 254 (E.D.N.Y. 2025) (construing a motion to dismiss an APA claim as a motion for summary judgment where court had before it the certified administrative record).

Summary judgment is the appropriate procedural vehicle to decide an APA case "because on summary judgment, the court decides the legal issue of whether the agency's

action was arbitrary and capricious . . . by reviewing the administrative record compiled by that agency when it made the decision." *Saleh v. Blinken*, 596 F. Supp. 3d 405, 413 (E.D.N.Y. 2022) (cleaned up), *aff'd*, No. 22-1168, 2023 WL 5091819 (2d Cir. Aug. 9, 2023) (summary order). "A Rule 12(b)(6) motion to dismiss can be entertained in administrative law cases if the complaint presents *no factual allegations*, but rather only arguments about the legal conclusions to be drawn about the agency action." *R.J. Reynolds Tobacco Co. v. U.S. Dep't Agriculture*, 130 F. Supp. 3d 356, 369 (D.D.C. 2015) (cleaned up) (emphasis added). This because "the focal point for judicial review [under the APA] should be the administrative record." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

At this time, the Court will not make a final decision on the merits of Plaintiffs' APA claims. The Court cannot consider Defendants' fact-specific arguments on the current record, without the benefit of the certified administrative record or the additional breadth of evidence typically available during a preliminary injunction. The first two arguments—whether the BOP had discretion to terminate the CBA, and if so, whether that discretion was committed to agency discretion by law—require the factual conclusion that BOP had a choice *whether* to terminate the CBA. This issue is not clear from the face of the Executive Order. And the parties have different interpretations of the OPM's guidance stating that agencies "may choose" whether to terminate: Plaintiffs claim this is evidence of BOP's ability to independently terminate the CBA, Defendants claim this only refers to agencies' ability to decide the timeline of termination.[48] The current record does not reflect whether BOP and Director Marshall chose to terminate the CBA, or whether they only decided when terminate it. The third argument—

---

[48] ECF No. 51 at 9–10.

that Plaintiffs cannot establish that Director Marshall's motivations in terminating the CBA were pretextual—requires the Court to analyze Director Marshall's specific motivators in terminating the CBA. All of these inquiries require an extensive analysis of the factual allegations in this case. Thus, the Court will not decide them in the first instance on the Motion to Dismiss without the benefit of the certified administrative record or the additional evidence permitted on a motion for preliminary injunction.

## III.    MOTION TO STAY

The Government moves, in the alternative, to stay this case pending the final outcome in *AFGE II* out of the Northern District of California for "prudential reasons."[49] The Court finds no reason to do so.

"A court may stay a case pursuant to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *SDJ Invs., LLC v. Collector's Coffee Inc.*, No. 21-2070, 2022 WL 17097231, at *2 (2d Cir. Nov. 22, 2022) (summary order) (quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997)). Courts consider three factors in determining the appropriateness of a stay: "(1) whether a stay will simplify the issues in question and trial of the case; (2) the stage of the proceedings; and (3) whether a stay will prejudice the nonmoving party." *Tadayon v. DATTCO, Inc.*, No. 12-CV-1610 (JAM), 2014 WL 12755795, at *1 (D. Conn. Aug. 8, 2014) (cleaned up).

---

[49] ECF No. 40-1 at 34.

21

First, Defendants assert that the instant matter has "significant factual and legal overlap" with *AFGE II*.[50] However, as the Court has already determined, these are distinct cases concerning discrete issues: *AFGE II* concerns the validity of EO 14,251, and the instant case concerns the termination of a single CBA. While both cases involve EO 14,251, the overlap is not such that waiting on final resolution in that case will inherently simplify the issues in question here. As already discussed, there is no claim-splitting issue, and  this case will proceed independently of *AFGE II*. Second, while *AFGE II* is further along in proceedings, it is not at such a stage where a final judgment is imminent. Third, Defendants assert that there is no "undue prejudice" to the Plaintiffs because they expect a dispositive ruling from the Ninth Circuit in *AFGE II* on the district court's preliminary injunction.[51] The Ninth Circuit has now ruled and reversed that preliminary injunction the merits. As such, there is no indication that *AFGE II* will resolve in the near future, and the Plaintiffs should not be forced to stall their claims until there is a final judgment in *AFGE II*.

## IV.   **<u>MOTION TO TRANSFER</u>**

Having denied the Motion to Dismiss, the Court turns to consider the Government's Motion to Transfer. Here, the Government makes an unusual argument asking the Court to transfer this case to the District Court for the District of Columbia ("D.D.C.") because "Washington is the location where [EO 14,251] was signed and from where Director Marshall issued a September 25, 2025, letter terminating the collective bargaining agreement[.]"[52] It also claims that D.D.C. is the proper forum because it is the "location of BOP headquarters

---

[50] *Id.* at 32.

[51] *Id.*

[52] ECF No. 41-1 at 1–2.

and its managing officials" and "any prospective witnesses would be in Washington, D.C."[53] In summary, the Government asks this Court to transfer the matter because the President and members of his administration took executive actions from their offices in the nation's capital. The Court will not stretch the boundaries of transfer doctrine in such a way.

"[T]he party requesting transfer carries the burden of making out a strong case for transfer." *N.Y. Marine and Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) (cleaned up). To do so, the party seeking transfer must demonstrate "'by clear and convincing evidence' that the balance of convenience favors transfer." *Ambrose v. Lee*, No. 25-CV-398 (SVN), 2026 WL 884031, at *11 (D. Conn. Mar. 31, 2026) (quoting *N.Y. Marine*, 599 F.3d at 114). The factors to be considered are:

> (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, and (7) the relative means of the parties.

*New York Marine*, 599 F.3d at 112.

The Court begins, admittedly out of order, with the fifth factor: the locus of operative facts. "To determine the locus of operative facts, a court must look to the 'site of the events from which the claim arises.'" *Charter Oak Fire Ins. Co. v. Broan-Nutone, L.L.C.*, 294 F. Supp. 2d 218, 220 (D. Conn. 2003) (cleaned up). Defendants argue that the operative facts occurred in Washington, D.C. because that is from where EO 14,251 was signed and where Director Marshall issued the termination letter.[54] In so arguing, the Government ignores the

---

[53] *Id.* at 2.

[54] *Id.* at 6.

23

significant ties this case has to Connecticut. It involves Local 1661, a Connecticut-based union, and FCI Danbury, a Connecticut-based BOP facility. And it concerns the impact of the termination of the CBA on Connecticut residents who work at FCI Danbury and were represented by Local 1661. The termination of the CBA impacted those employees' schedules, overtime, and day-to-day working conditions. Nevertheless, the Court agrees that all of the relevant facts are not found in Connecticut. Of course, federal officials took actions that impacted this matter from their offices in Washington D.C. But Washington D.C. does not inherently become the "locus of operative facts" because executive action occurs there. Accordingly, the locus of operative facts is Connecticut, as that is the site of the events from which the claim arises, and this factor weighs against transfer.

The first factor, a plaintiff's choice of forum, also weights against transfer. "A plaintiff's choice of forum is generally entitled to considerable weight and should not be disturbed unless the balance of the factors is strongly in favor of the defendant. Where the factors are equally balanced, the plaintiff is entitled to its choice." *Ambrose*, 2026 WL 884031, at *12 (cleaned up). This deference exists unless the "operative facts have little connection with the chosen forum." *Charter Oak Fire Ins. Co.*, 294 F. Supp. 2d at 220. Here, the facts in this action have significant connection to Connecticut. Accordingly, the Court sees no reason to depart from the deference given to Plaintiffs in choosing their forum.

The second factor, convenience of the witnesses, also weighs in favor of Plaintiffs.[55] The Government asserts that any potential witnesses are located in Washington D.C. That is

[55] There is an ongoing dispute as to whether discovery or the introduction of evidence outside of the certified administrative record is warranted. *See* ECF No. 39. The Court will not decide that dispute at this juncture. Rather, it considers the use of witnesses for the sake of deciding the instant

24

incorrect and ignores the fundamental fact that this case concerns Local 1661, a Connecticut-based union, and FCI Danbury, a Connecticut-based BOP facility. While the witnesses Defendants anticipate calling may be based in Washington D.C., Plaintiffs anticipate calling Connecticut-based witnesses.[56] For instance, Plaintiffs intend to rely on the testimony of Robert Curnan, the President of Local 1661, to establish Local 1661's standing and for consideration of remedies.[57] Of course, some potential witnesses are based in Washington D.C. because this case concerns the actions of the President and federal employees. But, as the Court has already explained, the sheer fact that federal government officials reside and work in Washington D.C. does not inherently warrant transfer to D.D.C. Thus, the convenience of the witnesses and parties favors the District of Connecticut.

The remaining four factors are neutral. Factor three, the location of relevant documents and relative ease of access to sources of proof, does not carry much weight now, "in light of technological advances in transportation and communication." *Ambrose*, 2026 WL 884031, at *12. Factor four, the convenience of the parties, is neutral because Plaintiffs have counsel located in both Washington D.C. and in Connecticut. Defendants are represented by the Government, which is certainly capable of litigating in Connecticut. And the Plaintiffs indicated that they are willing to travel to Washington D.C. to conduct discovery, if necessary. Thus, there is no burden on the parties to litigate in Connecticut. Factor six, the availability of process to compel the attendance of unwilling witnesses, is inapplicable because there is no

---

Motion to Transfer, as the parties did in their briefs. *See* ECF No. 41-1 at 8, ECF No. 49 at 7. If witnesses are not required, and the case is decided solely on the basis of the certified administrative record, this factor is rendered neutral.

[56] ECF No. 49 at 7–8.

[57] *Id.*

indication that the parties seek to call unwilling witnesses. And finally, factor seven, the relative means of the parties, is also neutral because the federal government has the means to litigate in Connecticut, and Plaintiffs have chosen the District of Connecticut as their forum.

The balance of convenience factors favors keeping the matter in the District of Connecticut, and the Government has not met its burden of demonstrating otherwise by clear and convincing evidence. Accordingly, the Motion to Transfer is **denied**.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motion to Dismiss, or in the alternative, to stay, (ECF No. 40) and Motion to Transfer (ECF No. 41) are **DENIED**.

<b>SO ORDERED.</b>

Hartford, Connecticut
April 28, 2026

/s/Vernon D. Oliver
VERNON D. OLIVER
United States District Judge