**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| NATIONAL COUNCIL OF PRISON LOCALS et al., Plaintiffs, | : | No.: 3:25cv1907 (VDO) |
| v. | : | |
| FEDERAL BUREAU OF PRISONS et al., Defendants. | : | October 8, 2026 |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONTEMPT OR IN THE ALTERNATIVE TO ENFORCE**

Pursuant to Local Civil Rule 7(a) and the Court's October 7, 2026 order, ECF. No. 76, Defendants, the Federal Bureau of Prisons ("BOP") and William K. Marshall III, in his official capacity as Director of the BOP, file this response in opposition to Plaintiff's Motion for contempt or in the alternative to enforce ("the Motion" or "Mot.") this Court's preliminary injunction, ECF No. 75.

At the outset, it bears noting that Plaintiffs state in the Motion that Defendants' Notice of Compliance, "outlines certain matters that Defendants 'do not understand the injunction' to require or permit the Court to enforce," Mot. Memorandum of Law, ECF No. 75-1, p. 1, but Plaintiffs do not otherwise address or dispute the part of Defendant's Notice of Compliance stating Defendants do not understand the preliminary injunction to bar Defendants from re-terminating the relevant Collective Bargaining Agreement ("CBA") in a fresh decision before the end of the CBA's Term. Defendant Marshall issued a fresh decision re-terminating the CBA on October 7, 2026. *See* Declaration of Jonathan Hemingway, Senior Deputy Assistant Director for the BOP Human Resource Management Division, attached hereto as Exhibit 1 ("Hemingway Declaration") at Exhibits A and B. And, as mentioned, Plaintiffs have not contested in this motion Defendants'

ability to re-terminate in compliance with this Court's Memorandum & Order ("Order") entering a preliminary injunction.

Defendants are compliant with the Court's Order" entering a preliminary injunction, ECF No. 72. Per the Court's order, comprehensive evidence of the efforts that were taken by Defendants to reinstate the CBA are outlined in the Hemingway Declaration. Following the Court's Order and the reinstatement of the CBA, and prior to the CBA's re-termination, the BOP took many steps including, *inter alia*, instructing wardens to ensure a private space is available for Union officials to meet with their members as needed on an ad hoc basis; instructing wardens at all BOP locations to consider all requests for Official Time on a case-by-case basis pursuant to Article 11, and to authorize reasonable official time; and engaging with the Union and arbitrators on grievances and beginning to schedule them for hearing or other proceedings as appropriate. *See* Hemingway Declaration, generally. Defendants took steps the morning following the Court's Order and throughout the days leading up to the re-termination. *See id.*, ¶¶ 9-13.

At bottom, the Plaintiffs' Motion is an improper invitation for the Court to police the terms of the reinstated Collective Bargaining Agreement ("CBA") between the BOP and Plaintiff National Council of Prison Locals, American Federation of Government Employees ("CPL-33"), prior to its re-termination. The root of this improper request is clear: Plaintiffs conflate the Court's order *reinstating* the CBA (including its panoply of remedies available for breach thereof) with an order mandating *adherence* to each and every one of its terms (under penalty of judicial contempt). The reinstated CBA itself provided the remedy for alleged breaches of its terms. Thus, Plaintiffs' recourse for alleged breaches prior to re-termination were to follow the procedures provided in the Agreement—the same procedures that they followed before the September 25, 2026, termination of the CBA. Accordingly, the Court should deny Plaintiffs' motion.

## I. BACKGROUND

The Court is familiar with the facts of this case. To summarize, the Federal Service Labor-Management Relations Statute ("FSLMRS") authorizes the President to exempt from its coverage "*any* agency or subdivision thereof" if the President makes the determination that (A) "the agency . . . has as a primary function intelligence, counterintelligence, investigative, or national security work," and (B) the provisions of the statute "cannot be applied to that agency . . . in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1) (emphasis added). Like most Presidents before him, on March 27, 2025, President Trump issued such an order. Specifically, in Executive Order 14,251, *Exclusions from Federal Labor-Management Relations Programs* ("the EO"), the President made the required determinations, thereby excluding from statutory coverage the identified agencies and agency subdivisions including, as relevant here, the DOJ, which includes the BOP.

On September 25, 2025, the Director of the BOP notified CPL-33 that "[a]s a result" of "the President's broad authority under 5 U.S.C § 7103(b)(1) to exempt agencies" including the DOJ—and "based on the EO [14,251]"—the BOP "no longer recognizes [CPL-33] as the exclusive representative for employees of the existing bargaining unit." ECF No. 28-5.

On November 13, 2025, Plaintiffs, CPL-33 and Local 1661, filed this action. *See* Complaint, ECF No. 1 ("Compl."). Plaintiffs advance two causes of action, both of which state they fall under the APA's "scope of review" for an agency decision. First, they argue that the BOP's September 25, 2025, termination of the CBA between the BOP and CPL-33 was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Compl. ¶¶ 56–65. Second, Plaintiffs argue that the BOP decision was in violation of the APA, 5 U.S.C. § 706(2)(B), because it represented impermissible retaliation in violation of the First

Amendment. Compl. ¶¶ 66–70. For relief, Plaintiffs request that this Court enter a permanent injunction prohibiting Defendants from effectuating the termination of the CBA. *See* Compl., p. 17.

On December 22, 2025, Plaintiffs filed their preliminary injunction ("PI") motion. *See* ECF No. 28-1 (PI Memo). On February 13, 2026, Defendants filed a motion to dismiss. *See* ECF No. 40. On April 28, 2026, the Court denied Defendants' motion to dismiss and, on April 30, 2026, heard oral argument on Plaintiffs' PI motion. *See* ECF Nos. 54 and 56. The Court also set a deadline to produce the CAR by May 13, 2026, in accordance with its prior order and set a deadline for Plaintiffs to file a motion for supplemental discovery and briefing schedule for such a motion. *See* ECF No. 57. Defendants produced the CAR on May 13, 2026, *see* ECF No. 59, and filed an answer on July 8, 2026. *See* ECF No. 69.

On September 29, 2026, the Court granted Plaintiff's PI motion. *See* Order, ECF No. 72. In the Order, the Court found the BOP Director's termination letter and public message were contradictory and, "[a]lthough an agency may have multiple reasons for its action, it cannot offer an entirely pretextual explanation that is undermined by its own contradictory assertions made the same day." *Id*., p. 26. As such, the Court concluded that "Plaintiffs are likely to succeed on their claim that Defendants' decision to terminate the CBA was arbitrary and capricious in violation of the APA." *Id*., p. 27. The Court also found Plaintiffs demonstrated that they will suffer irreparable harm that could not otherwise be remedied in the absence of a preliminary injunction and that the balance of the equities and the public interest also weigh in favor of granting a preliminary injunction. *Id*., pp. 27-30. In granting the preliminary injunction, the Court concluded with an order that "Defendants shall immediately reinstate the CBA, as well as any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the

CBA, for the remainder of the agreed-upon term provided in the CBA." *Id.*, p. 32. Earlier in its Order, the Court also stated that "Defendants shall immediately reinstate the CBA for the remainder of the agreed-upon term provided in the CBA, and shall be governed by the terms of that agreement." *Id.*, p. 2.

On October 2, 2026, Defendants filed a notice of compliance stating Defendants are aware of the Court's Order and aver they are complying with its terms. *See* ECF No. 75. Defendants also explained their understanding of what such compliance entails. Specifically, Defendants do not understand this Court's injunction to preclude the agency from making a fresh decision to terminate the CBA before the end of the agreed-upon term, nor do they read the injunction as indicating that the district court intends to supervise every alleged failure to perform a CBA term in lieu of the CBA's own grievance and arbitration mechanisms. *See id.* Plaintiffs then filed the Motion on October 6, 2026, and the Court ordered a response by October 8, 2026, at 11:00 AM EST. *See* ECF Nos. 75-76.

## II. LEGAL STANDARD

A contempt order "is a 'potent weapon,' to which courts should not resort where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (quotations omitted). It is the moving party's burden to establish "by clear and convincing evidence that the alleged contemnor violated the district court's edict." *Id.* (citation omitted). "A party may be held in civil contempt for failure to comply with a court order only if: '(1) the order ... is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.'" *Liberty Propane L.P. v. Feheley*, 522 F. App'x 38 (2d Cir. 2013) (quoting *Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.,* 369 F.3d 645, 655 (2d

Cir.2004))). "A clear and unambiguous order is one that leaves no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden." *King*, 65 F.3d at 1058 (quotations omitted).

## III. ARGUMENT

### A. Defendants have not violated the Court's Order

Defendants have complied with the Court's Order. The Court's Order states, in part:

> The September 25, 2025, termination of the CBA is preliminarily set aside and enjoined. Defendants shall immediately reinstate the CBA for the remainder of the agreed-upon term provided in the CBA, and shall be governed by the terms of that agreement. Defendants shall also reinstate any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the CBA.

Order, p. 2, ECF No. 72. Defendants reinstated the CBA along with any amendments, local supplemental agreements, and memoranda of understanding that were in place subsidiary to the CBA. *See* Hemingway Declaration, ¶ 10; *see also* Notice of Compliance, Exhibit 1, ECF No. 75-1. As noted in Defendants Notice of Compliance, they assume this Court's Order did not mean the district court intended to supervise every alleged failure to perform a CBA term following the Order to reinstate the CBA prior to its re-termination. But despite Plaintiffs assertion to the contrary,[1] Defendants had diligently worked over the last week to "turn back on" normal operations under the reinstated CBA prior to re-termination, and that effort takes time after more than a year after its termination. As one example, Mr. Hemingway describes how in the year between the first termination of the CBA and the Court's Order, BOP reclaimed thousands of square feet of office space, as well as significant amounts of information technology ("IT")

[1] Plaintiffs filed a "Notice Relating to Motion for Contempt or in the Alternative to Enforce" on October 7, 2026, "Plaintiffs' Counsel became aware that Defendants have approved official time requests for members of the CPL-33 board, including for CPL-33 President Brandy White yesterday" as well as several other instances of compliance. *See* ECF No 78.

equipment and other resources, that had been provided to local BOP union chapters and their members free of charge. Hemingway Declaration, ¶ 16. The space and resources formerly used by union representatives and members has already been repurposed by BOP institutions and much of it is now used for mission-related work. *Id.* Following issuance of the Preliminary Injunction, and prior to re-terminating the CBA, however, institutions had been instructed to identify space to be used by the Union on a permanent basis. *Id.* This process would take time to identify space at each of the approximately 122 institutions, many of which have extremely limited space available, and ensure it is habitable for use by the Union. *Id.* Nonetheless, prior to the October 7, 2026, termination, at least one institution had identified space to be utilized by its local union. *Id.* Until more permanent office space could be identified prior to the re-termination, the Regional Directors instructed wardens to ensure a private space was available for Union officials to meet with their members as needed on an ad hoc basis. *Id.*

Additionally, BOP took the following many steps:

- Following issuance of the Preliminary Injunction, and prior to re-terminating the CBA, Wardens at all BOP locations were instructed by their respective Regional Directors to consider all requests for official time on a case-by-case basis pursuant to Article 11 of the Master Agreement, and to authorize reasonable official time request. In the short time since the Order was issued on September 29, 2026, the Agency has received several hundred requests for official time pursuant to Article 11. Local management officials immediately began reviewing these requests on a case-by-case basis and reasonable requests for official time were granted in accordance with Article 11 of the Master Agreement. Hemingway Declaration, ¶ 14. For example:
    - Multiple Union officials at USP Lee in Virginia requested, and were granted, a total of 40 hours of official time. Hemingway Declaration, ¶ 14a.
    - Union officials at FCI McDowell in West Virginia requested, and were granted, 16 hours of official time. Hemingway Declaration, ¶ 14b.
    - National Union President Brandy Moore White requested, and was granted, to be placed on 100% official time. Hemingway Declaration, ¶ 14c.
    - Union officials at FCI Tucson in Arizona requested, and were granted, a total of 32 hours of official time. Hemingway Declaration, ¶ 14d.
    - Thomas Moore, who is the National Legislative Coordinator for the Union requested, and was granted, 100% official time. Hemingway Declaration, ¶ 14e.

- The local union president at FCI El Reno in Oklahoma requested, and was granted, eight hours of official time. Hemingway Declaration, ¶ 14f.
- The local union president at FCI Three Rivers in Texas requested, and was granted, two hours of official time. Hemingway Declaration, ¶ 14g.

- Following issuance of the Preliminary Injunction, and prior to the October 7, 2026, termination, the Bureau ceased utilizing the streamlined policy development process which it implemented in December 2025. Under that process, over 130 new, updated, or cancelled policies were issued in a nine-month period. No new or updated policies or procedure memoranda have been issued since September 29, 2026. Prior to issuance of the new termination, the Agency expected to engage with the Union regarding new or updated policies and procedural memoranda as such documents are completed, in accordance with the procedures agreed to by the Agency and the Union prior to the September 25, 2025, termination. This includes recently completed policies and procedural memos such as: Authorization for Use of Expandable Batons; Information Security and Resources Protection; Accounts Payable; Federal Prison Industries Physical Inventories; Federal Prison Industries Product, Plant, and Equipment; Volunteer Services; and Pretrial Inmates. Hemingway Declaration, ¶ 15.

- Following issuance of the Preliminary Injunction, and prior to the October 7, 2026, termination, Wardens have been instructed to allow Union officials to provide representation to bargaining unit employees during official meetings, interviews pursuant to an investigation, and during the disciplinary process. For example, at FCI Phoenix in Arizona, the Union provided representation to an employee during their oral response to a disciplinary proposal. Hemingway Declaration, ¶ 17.

- Following issuance of the Preliminary Injunction, and prior to the October 7, 2026, termination, the grievance system pursuant to Article 31 of the Master Agreement was available for use by all employees to raise concerns including violations of the contract or failure to comply with the terms of the Preliminary Injunction. Article 31 instructs employees and the Union to file grievances at the institution level. Hemingway Declaration, ¶ 18.[2]

- Since September 29, 2026, some arbitrators and Union representatives have engaged with Agency representatives to re-activate some of these arbitrations. The Agency has engaged with the Union and arbitrators on such grievances and, prior to the October 7, 2026, termination, the Agency had begun scheduling them for hearing or other proceedings as appropriate. Hemingway Declaration, ¶ 19.[3]

---

[2] Mr. Hemingway is not aware of any grievances being filed between September 29, 2026 and October 7, 2026. *See* Hemingway Declaration, ¶ 18.

[3] Following issuance of the Preliminary Injunction, and prior to the October 7, 2026, termination, Mr. Hemingway was aware that some grievances in which arbitration was previously invoked pursuant to Article 32 of the Master Agreement were held in abeyance following the September 25, 2025, termination. *See* Hemingway Declaration, ¶ 19.

- Following issuance of the Preliminary Injunction, and prior to the October 7, 2026, termination, the Bureau was in the process of directing its payroll service provider to restart collecting union dues for CPL-33 members. BOP's ability to restart dues automatically for union members is limited because AFGE has been promoting the use of its internal dues collection system, "e-Dues." BOP does not have information on which employees may now be paying membership dues directly through the e-Dues system. As a result, restarting automatic payroll deductions for all impacted employees could harm those employees by having double payment of dues; and requires substantial effort by human resource staff to ensure information is inputted correctly and accurately. Hemingway Declaration, ¶ 20.

- Following issuance of the Preliminary Injunction, and prior to the October 7, 2026, termination, local union officials at numerous institutions have requested meetings with institution management, to include the resumption of labor-management relations (LMR) meetings. Local management officials have been instructed to begin scheduling such requested meetings, to include LMR. Such meetings are being scheduled as soon as reasonably practicable. At FCI Gilmer in West Virginia, for example, a union representative was invited to attend a committee meeting, consistent with the Master Agreement and Program Statement 3730.06, *Workplace Violence Prevention, Staff*. Hemingway Declaration, ¶ 21.

- To the best of Mr. Hemingway's knowledge, since the issuance of the Preliminary Injunction, and prior to the October 7, 2026, termination, the Union has not requested to schedule national LMR meetings, nor have they sought to invoke negotiations on any specific policy proposals. Had such requests been received prior to the October 7, 2026, termination, the Bureau would have engaged with the Union to schedule and engage in negotiations as appropriate. Hemingway Declaration, ¶ 22.

- Each institution controls access to the roster program locally. Mr. Hemingway is aware multiple union officials have requested roster access from their assigned institutions. All such reasonable requests for access were in the process of being authorized at the time of the October 7, 2026, termination. Hemingway Declaration, ¶ 23.

- Scheduling for most employees is done on a quarterly basis. The roster for the current quarter was approved weeks ahead of the start of the new quarter, and staff had been notified of their assigned posts, shifts, and schedules at each location. There was no way to feasibly alter these schedules or engage with the Union to negotiate new schedules prior to the beginning of the quarter. Beginning with the next quarter (which begins on or around January 1, 2026), prior to re-termination, the Bureau was prepared to discontinue its reliance on 12-hour shifts for certain custody posts and plans to revert back to the schedules in place prior to September 25, 2025, until appropriate negotiations could take place related to the use of 12-hour custody shifts. Prior to re-termination, that process would have continued for the next quarter. Hemingway Declaration, ¶ 24.

- Following issuance of the Preliminary Injunction, and prior to re-terminating the CBA, the Agency took numerous actions to re-implement the terms and provisions of the Master Agreement as it related to misconduct, investigations, and adjudication. Hemingway

Declaration, ¶ 25.

- The Agency ceased implementation of the "irrefutable evidence" standard for misconduct in reliance on the procedures in Article 30 of the Master Agreement. Hemingway Declaration, ¶ 25a.
- The Agency ceased implementation of the voluntary misconduct diversion program in reliance on the procedures in Article 30 of the Master Agreement. Hemingway Declaration, ¶ 25b.
- The Agency ceased implementation of updated timeframes in which to provide a response to disciplinary and adverse actions. Instead, new proposed discipline and new proposed adverse actions issued prior between September 29, 2026 and October 7, 2026, will allow employees to respond in accordance with the timeframes articulated in Article 30(j) of the Master Agreement. Hemingway Declaration, ¶ 25c.
- As indicated above, following issuance of the Preliminary Injunction, and prior to re-terminating the CBA, local management officials had been instructed to allow Union representation during misconduct investigation and during the disciplinary process, in accordance with applicable regulations issued by the Office of Personnel Management (OPM). Reasonable official time for such purposes had been authorized. Hemingway Declaration, ¶ 23e.

Plaintiffs allege that wardens have been told not to comply with the PI and not to work with the union. *See* Motion, pp. 1-2. As indicated above, the BOP avers no such guidance was given by BOP leadership. *See* Hemingway Declaration, ¶ 26. On the contrary, beginning the morning of September 30, 2026, Mr. Hemingway describes the focus of BOP senior leadership being on implementation and compliance with the Preliminary Injunction and remained the focus of Bureau leadership until the agreement was terminated on October 7, 2026. *Id.* Specifically, when BOP senior leadership met on Monday, October 5, 2026, the six Regional Directors were explicitly instructed to notify the wardens in their respective regions to comply with the Court's Order. *Id.* Indeed, since filing the Motion, and prior to re-terminating the CBA, Plaintiffs have acknowledged instances of compliance, *see* n. 1, *supra*, but maintain that as of October 7, 2026, they are not "aware of any central guidance that BOP leadership has provided to wardens that withdraws or contradicts the BOP guidance that directed non-compliance, as described in Plaintiffs' motion." *See* ECF No. 78, p. 1. But Mr. Hemingway notes that he and other leaders

from BOP Human Resources Management Division have been communicating with the Regional Directors regularly since the Preliminary Injunction was issued. *See* Hemingway Declaration, ¶ 27. At no time have any of the Regional Directors brought any such unapproved or inappropriate communications to his attention. *Id.* Nonetheless, even if a warden or management official at an isolated institution made such an inappropriate statement, BOP maintains that such a statement would have been inconsistent with the agency's position, inconsistent with guidance issued to the Regional Directors, and could have been rectified through the normal grievance procedures pursuant to Article 31 of the Master Agreement. *Id.*

Because Plaintiffs have not, and cannot, carry their burden of proving by clear and convincing evidence that Defendants have violated the Court's Order, their motion to enforce should be denied.

**B. Plaintiffs seek to enforce requirements that exceed the Court's Order**

Plaintiffs argue Defendants "have not restored union office space or official time, allowed for union representation in disciplinary proceedings, or taken any of the other myriad specific steps that Defendants themselves told the Court would be required if the Court entered the requested injunction" and urge the Court to "find that Defendants are in civil contempt and order Defendants to purge that contempt through immediate compliance." Mot. Memorandum of Law, ECF No. 75-1, pp. 2, 12. CPL-33 has 30,000 members, s*ee* ECF No. 28-2, ¶ 4, and Plaintiffs' assertion that any instance of one of its members asserting an alleged failure to perform a CBA term is evidence of noncompliance with the Court's Order at the penalty of contempt, would be the type of order that has already concerned the First Circuit and led to that court's issuance of two stays of orders issued out of the District of Rhode Island in a similar case. *See* Notice of Compliance, ECF No. 75, p. 1; *see also Am. Fed'n of Gov't Emps. Loc. 2305 v. United States Dep't of Veterans Affs.*, No. 26-

1321, ---F. 4th--- 2026 WL 2969474, at *4 (1st Cir. Oct. 2, 2026); *Am. Fed'n of Gov't Emps. Loc. 2305 v. United States Dep't of Veterans Affs.*, 177 F.4th 1 (1st Cir. 2026) (staying enforcement order requiring compliance with the CBA "in both form and substance" on sovereign-immunity grounds).[4]

Plaintiffs' motion conflates *reinstating* the CBA with *adhering* to each and every one of its terms. *See, e.g.,* Mot. Memorandum of Law, ECF No. 75-1, p 2. In other words, Plaintiffs argue that if the BOP was not adhering to every term of the CBA between the Court's Order and the re-termination, as Plaintiffs understand it, the BOP is not merely in breach of the CBA but also in violation of the preliminary injunction. That is mistaken.

The existence of a contract does not guarantee that both parties will adhere to each and every contract term indefinitely. Rather, the existence of a contract provides both parties to the contract certain rights and remedies if the other party breaches. *See United States v. Winstar Corp.*, 518 U.S. 839, 919 (1996) (Scalia, J., concurring in the judgment) ("Virtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance. . . ." (emphasis omitted)); *see generally* Restatement (Second) of Contracts § 1 (Am. Law Inst. 1981) (defining a "contract," as "a promise or a set of promises for the breach of which the law gives a remedy").

It is unsurprising that CPL-33 would occasionally accuse BOP of violating the CBA between the Court's Order and the re-termination in its treatment of one of the 30,000 employees

[4] Curiously, Plaintiffs suggest a civil contempt order would be more appropriate given "the jurisdictional issues that arose in *American Federation of Government Employees Local 2305 v. U.S. Department of Veterans Affairs*, No. 1:25-cv-00583 (D.R.I.) where the district court issued an order to enforce its injunction. *See* 177 F.4th 1, 17 (1st Cir. 2026)." *See* Mot. Memorandum of Law, ECF No. 75-1, pp. 2, pp. 2-3. Plaintiffs do not grapple with the First Circuit's conclusions. Nor do they explain how a court order that would be jurisdictionally improper as an enforcement order would somehow become proper in civil contempt.

covered by that agreement. As Plaintiffs acknowledge, under Article 31 "the CBA [ ] establishes grievance and arbitration procedures for employees and the union to resolve disputes with the agency over employment matters. . . . and grievances must be resolved according to the procedures delineated in that article." Decl. of Brandy White, ECF No. 28-2, ¶ 14; *see also* ECF No. 40-3 at pp. 75-81 (Articles 31-33). "Any employee has the right to file a formal grievance." ECF No. 40-3 at p. 75 (Articles 31, § c). If Plaintiffs had a good-faith basis for contending that the BOP has breached a provision of the CBA, Plaintiffs' remedy was to file a complaint under the grievance procedures set out in the CBA, rather than filing a motion to enforce or for contempt with the Court.

Even before President Trump issued the Executive Order that led to the BOP CBA's termination, Plaintiffs routinely filed complaints, using the negotiated grievance procedures in the CBA, in which employees or Plaintiffs themselves alleged the CBA was not being followed in a specific situation. *See* Decl. of Brandy White, ECF No. 28-2, ¶ 13. Plaintiffs should have followed the same practice between the Court's Order and the re-termination. Indeed, it makes no sense to think the preliminary injunction requiring the CBA's reinstatement required BOP to remedy any and all labor grievances with Plaintiffs, even if those disputes were already in existence *before* the CBA's termination. The injunction simply restored the parties to the status quo as it existed before the CBA's termination.

Plaintiffs attempt an end-run around the exclusive procedures for resolving grievances that arose under the CBA between the Court's Order and the re-termination for the several alleged instances by its members asserting an alleged failure to perform a CBA term, and request the Court trigger the "potent weapon" of "judicial contempt power." *Int'l Longshoremen's Ass'n v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967). Such an approach would be improper as a matter of

federal labor law,[5] federal contracting law, and even the ordinary common law of contracts.[6] Indeed, federal courts are prohibited from ordering specific performance of government contractual provisions and policing non-compliance. *See, e.g.*, *Up State Fed. Credit Union v. Walker*, 198 F.3d 372, 377 (2d Cir. 1999) ("The Tucker Act impliedly forbids relief other than remedies provided by the Court of Federal Claims for actions that arise out of a contract with the United States." (cleaned up)); *Presidential Gardens Assocs. v. United States ex rel. Sec'y of Housing & Urban Dev.*, 175 F.3d 132, 143 (2d Cir. 1999) ("Actions seeking specific performance of a contract, brought in order to avoid the Tucker Act's limitation on money judgments, are not allowed to be brought against the United States."); *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004) ("We have held that the Tucker Act "'impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief, which the Claims Court may not.'"). Plaintiffs' claim is founded in a contract, not a separate agency or government-wide policy (such as the EO). Their suit is premised on an alleged breach of contract—BOP's termination of the collective-bargaining agreement. And this motion is premised on an alleged breach of contract—Plaintiffs now argue the BOP breached terms following the Order and prior to its re-termination. But the

[5] The FSLMRS contains a subpart governing how alleged violations of a collective bargaining agreement are to be handled, including grievances, appeals, and judicial review. *See* FSLMRS *See* 5 U.S.C. §§ 7121-712. None of the provisions governing judicial review and enforcement permit a labor union to petition a United States district court for a global and indefinite specific performance injunction. *See* 5 U.S.C. § 7123. To be sure, Plaintiffs are no longer subject to the FSLMRS by virtue of the Executive Order, which is unchallenged here. But it remains notable that even under that statute, this sort of remedy would clearly not have been permissible.

[6] Specific performance remedies must be narrow and targeted; courts will not decree specific performance of vague, indefinite, or uncertain contractual requirements. *See* Restatement (First) of Contracts § 370 (1932) ("Specific enforcement will not be decreed unless the terms of the contract are so expressed that the court can determine with reasonable certainty what is the duty of each party and the conditions under which performance is due.").

Court's relief was plainly contract-based—the preliminary injunction ordered reinstatement of the contract—and Plaintiffs seek a contempt order requiring compliance with the contract's terms. And, as noted above, this is precisely the type of order that the Court lacks authority to issue. In short, this Court does not have jurisdiction to entertain Plaintiffs' request to find Defendants in contempt and police across-the-board compliance with the terms of the CBA between the Court's order and the re-termination, and that is certainly not what the preliminary injunction does.

The status quo before the September 25, 2025, CBA termination further illustrates how Plaintiffs' Motion overstates what the Court's Order requires. A "'prohibitory' injunction" is designed to restore "the status quo." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35, n. 4 (2d Cir. 2010). Yet the status quo was not a situation where Plaintiffs could seek enforcement of the CBA in district court for alleged violations of the CBA's terms. Rather, before the CBA's termination, Plaintiffs filed labor grievances when they believed the BOP was out of compliance with the CBA. In other words, restoring Plaintiffs to the status quo would not restore them to a situation where Plaintiffs could seek district court intervention for every alleged violation of the CBA between the Court's order and the re-termination.

Moreover, Plaintiffs' motion fails to recognize the significance of the Executive Order—unchallenged in this case—which exempts the BOP from the FSLMRS's coverage. Executive Order, §§ 1, 2(c). Certain provisions of the CBA incorporate the FSLMRS to the extent applicable. *See, e.g.*, ECF No. 40-3 at pp. 1; 8; 10-11; 15; 23-24; 26, 33-34; 37; 41; 65; 75; 93. Thus, to the extent Plaintiffs seek to enforce any right afforded under the FSLMRS, their motion to enforce is without basis because the Order did not make Plaintiffs subject to the FSLMRS. Granting the Plaintiff's motion reinstating the CBA, and ignoring the existence of the Executive Order, would

demonstrably improve Plaintiffs' position over the original status quo and effectively place the Court in a position that it has overridden the Presidential Executive Order. This cannot be the case.

## IV. CONCLUSION

Plaintiffs' motion for contempt or alternatively to enforce should be denied. Defendants have already complied with the Court's Order. The relief the Plaintiffs seek via the Motion exceeds the relief afforded in the Court's Order.

Respectfully submitted,

THE FEDERAL BUEARU OF PRISONS; and WILLIAM K. MARSHALL III, in his official capacity as Director of the BOP, hereby respectfully

By their attorneys

DAVID X. SULLIVAN
United States Attorney

/s/
J. Brian Meskill (ct29611)
Assistant United States Attorney
450 Main Street, Rm. 328
Hartford, CT 06103
Tel.: 860-947-1101
Fax: (860) 760-7979
Email: Brian.Meskill@usdoj.gov

BRETT A. SHUMATE
Assistant Attorney General

Jeremy Mauritzen (CA Bar 354615)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs
Branch 1100 L Street, N.W.
Washington, D.C. 20005

Tel.: (202) 598-7315
Email: jeremy.mauritzen@usdoj.gov